COMMERCIAL NAT. BANK, COLUMBUS, OHIO, et al. v. TREASURER OF FRANKLIN COUNTY, OHIO.

No. 533.

District Court, S. D. Ohio, E. D.

Nov. 7, 1930.

Peck, Shaffer & Williams, of Cincinnati, Ohio, and James M. Hengst, of Columbus, Ohio, for plaintiffs.

John J. Chester, Jr., L. T. Williams, and R. J. Odell, all of Columbus, Ohio, for defendant.

HOUGH, District Judge.

The plaintiffs, the Commercial National Bank, the Huntington National Bank, and the Ohio National Bank, national banking associations of Columbus, Ohio, sue the treas-

urer of Franklin county, Ohio, who is the official tax collector of such taxes as are legally assessed and collectable against said plaintiffs, for an order of injunction to prevent the collection by said defendant of the taxes assessed against said plaintiffs for the last half of 1926 and the year 1927.

The basis for the remedy is that the taxes assessed under the state taxing machinery, and sought to be collected, are illegal and void, being in conflict with the federal statute granting the permission and privilege to the states to assess and collect taxes from national banks. Title 12, § 548, subsec. 1(b), USCA, also Rev. St. § 5219.

It is claimed that the employment of the state taxing machinery, in relation to these taxes of the plaintiff's banks and other national banks throughout the state of Ohio, not only is in conflict with the federal statute, but that some of the state taxing statutes are invalid in being in conflict with the federal statute, and also that the operative result of employing the state taxing plan is unconstitutional from the standpoint of the provisions of both state and federal Constitutions.

Taxes were paid for the first half of the year 1926, and payment was refused for the last half of that year. This proceeding was brought and collection restrained by a temporary order of this court. The plaintiffs protested the charging of the taxes for 1927, and, when charged, the collection thereof was restrained by a like order of the court, based upon the allegations of a supplemental petition. The plaintiffs have alleged in their bill that they are unable to determine the legal amount of taxes which they are obligated to pay, but that the payment of the first half of 1926 taxes is in excess of the amount properly chargeable for the entire year of 1926, and that they are ready and willing and offer to pay such tax or taxes as may be determined to be just, equitable, and legal.

The issues were referred to a special master who has heretofore heard the evidence, submitted his findings of fact and conclusions of law, together with the record and transcript of his proceedings. He determined that substantial amounts of moneyed capital in the hands of building and loan associations, mortgage companies, and finance companies were and are in competition with the business of the plaintiff's banks, and that there was and is substantial amounts of that moneyed capital assessed for taxation at a lesser rate than the taxes assessed on the shares of the stock of said plaintiff's banks,

and that; in result, the tax charges against the plaintiffs for the last half of the year 1926 and the year 1927 conflict with the federal statute (Rev. St. § 5219), and are invalid and void.

To the report of the master, including his findings of fact and conclusions of law, defendant has filed his exceptions, which have been submitted to the court on argument and brief.

The state taxing statutes provide (sections 5408, 5411, 5412, Gen. Code) that all shares of both state and national banks in the state shall be listed at the true value in money, and shall be taxed only in the taxing district where the bank is located, and shall be taxed on the basis of the value of the shares of the banks less pro rata deduction for the value of their real estate.

Section 9675, General Code, provides that the shares and loans to members of building and loan associations shall be exempt from taxation, except that shares of stock upon which no loans have been made or money advanced by the company shall be considered and held as credits. And section 5327, Gen. Code, defines credits for taxation to be the excess of the sum of all legal claims and demands over and above the sum of legal bona fide debts owing by the person. And the next section (5328) provides that all credits shall be subject to taxation, except as expressly exempted.

Section 5371, Gen. Code, provides that personal property, including moneys, credits, and investments, shall be listed in the taxing district where the person to be charged resides; and section 8625 et seq. fixes the legal residence of Ohio corporations in the place designated in its articles of incorporation. Certain mortgage and finance companies doing business in Columbus and other urban centers of the state have designated their place of residence in taxing districts outside the cities, and in some instances outside the counties in which the cities are located, where substantially lower tax rates are in vogue.

Sections 5404 and 5404—1, General Code, provide for the taxation of all personal property of incorporated companies except those especially provided for, used in the daily operation of the business of the company; and section 5328, General Code, excludes such of their property as is expressly exempted by law. Thus, finance and mortgage companies are not required to return or pay taxes on

their investments which are in the form of tax free obligations, that is, municipal, state, and United States bonds.

In arriving at the value of stockholder's shares of the plaintiff banks, the taxing officials have taken the capital stock, surplus, and undivided profits of the plaintiff banks, deducted from that total the value of the respective real estate owned by them, and then found the value of the shares of the respective banks, and upon that value applied the city rate for the year in determining the amount of taxes to be charged.

In 1926, the Commercial National Bank shares were thus assessed on a valuation of $1,226,830, and in 1927 on $1,298,120; the Huntington National Bank in 1926 on $2,671,750, and in 1927 on $2,143,000; the Ohio National Bank in 1926 on $2,848,560, and in 1927 on $2,944,430. In 1926 the aggregate of the capital, surplus, and undivided profits of the plaintiff banks was $6,750,000, and the deposits aggregated more than $42,000,000. The aggregate capital, surplus, and undivided profits of all national banks in the state was in excess of $132,000,000, and their deposits were more than $676,000,000.

It has been shown that some of the shareholders of the plaintiff banks owed debts in 1926, which, if the stock value had been treated as a credit and their debts deductable, would have materially lessened the amount of taxes to be paid upon their respective shares. It is further shown, by way of illustration, that, if one Huntington in the year of 1926 had been permitted a deduction of his debts, not otherwise deducted on his personal return, from his share holdings in the plaintiff bank, the Huntington National, there would have been a saving to him for that year of something over $5,000 in tax outlay.

The plaintiff banks, as well as other national banks in the city of Columbus and elsewhere in the state, exercise all the normal banking powers conferred upon them by law, including the receiving of commercial deposits, demand and time savings deposits evidenced by savings passbooks, and certificates of deposit, the purchase and sale of government, state, and municipal bonds, the maintenance of bond and trust deposits, the purchase and discount of commercial paper, including the discount of automobile paper, the loaning of money on financial statements and upon collateral security and upon mortgages executed to the bank or assigned and deposited with it as collateral security.

Under the latter type of business, that is, the mortgage business of the plaintiff national banks, the Commercial National Bank had loans in 1926 in substantial amounts—one of $40,000, one of $50,000, the latter for a term of five years, which were straight loans secured by mortgage, and other loans secured by mortgage and taken to secure debts previously incurred. The Huntington National Bank, plaintiff, held direct mortgages amounting to nearly $400,000, to secure prior indebtedness extending over different periods of time, some of which were for more than five years. This bank frequently took mortgages as security for bond issues. The Ohio National Bank held real estate mortgages made to it direct as security for loans of more than $400,000. And it made it a business practice of taking mortgage loans for periods of from five to ten, and in some instances more, years, payable in installments. Eight per cent. of the entire loans of this bank were made upon real property mortgages either direct loans or mortgages assigned to the banks as collateral security. The mortgage loan class made up about 5 per cent. of the total loans of the Huntington National Bank and about 2½ per cent. of the Commercial National Bank. Further than this, loans aggregating large amounts were made by plaintiff banks on the faith of financial statements presented by the borrowers, and, in the large majority of cases, real property furnished the chief, or at least an important, factor of asset in the financial statement. About the same condition applies to the other national banks in the city of Columbus, and in many other cities of the state. In the state of Ohio the national banks had outstanding loans of $525,000,000, of which nearly $49,000,000 were made on the security of real property, out of which more than $30,000,000 represented mortgages for debts previously contracted and for other causes. The three plaintiff banks had outstanding time and demand loans of over $17,000,000.

In 1926 the twenty-eight building and loan associations in the city of Columbus had invested capital in permanent, paid-up, and running stock of over $11,000,000, and the building and loan associations in the state of Ohio had an aggregate of capital stock in the three classes amounting to nearly $470,000,000. The total assets of the Columbus building and loan associations were about $100,000,000, and for the state of Ohio the total assets were nearly $1,000,000,000. The Columbus associations had reserve funds aggregating over $2,000,000,000 and undivided

profits funds aggregating over one and a half million of dollars, and in the state of Ohio the aggregate reserve was nearly $28,000,-000, and the undivided profits over $12,000,-000. Deposits in building and loan associations in Columbus, plus accrued interest, were more than $81,000,000, and for the state was over $350,000,000. Building and loan companies in Columbus and elsewhere in the state accepted deposits from their members and from the public generally, and actively competed with the national and state banks for the money of the public by advertising in the public press and otherwise. These deposits were received on savings accounts evidenced by passbooks, or certificates of deposit, or on running stock on which dividends were paid. Interest on deposits was paid in 1926 averaging 4.71 per cent., and the rate of dividends paid on stock averaged 5.47 per cent. Although constitutions and by-laws of the associations required notice as a condition to the right of depositors to withdraw savings, time deposits, and stock deposits, as a matter of uniform practice, the associations did not require such notice, but paid their depositors on demand and presentation of passbooks.

Building and loan associations of the city of Columbus in 1926 had outstanding mortgage loans in the aggregate amount of about $90,000,000, which was more than 90 per cent. of their total assets. In addition, they had passbook loans of about three-quarters of a million dollars. Of all the loans made by building and loans, 98 per cent. were mortgage loans. A large majority of all the mortgage loans were amortized loans, but loans in the substantial amounts were straight loans. The largest association in the city, namely, the Buckeye State Building & Loan Company, had more than $20,000,000 of amortized loans and over $10,000,000 straight loans. The great majority of the loans made by building and loan associations in Columbus were made upon residence property, only about 6 per cent. being made upon business property. Building and loan associations in Columbus uniformly required prospective borrowers to become shareholders by purchasing one or more or a fractional part of a share. Only a very few of the associations in Columbus operated under the old mutual plan, which required a stock subscription to the amount of the loan upon which the stock payments and dividends were credited, and, when the stock was fully paid up, both the stock and the loan were canceled. These few in number were also relatively small associations. Of the large majority of associations,

the par value of the stock subscription had no relation to the amount of the loan, and in most cases the amount of stock required to be subscribed was merely nominal, and upon which nothing more than the initial payment was required to be made.

In 1926 the three plaintiff national banks had investments in the United States government securities in the aggregate amount of more than three and one-half millions of dollars, and in state, county, and municipal bonds over $700,000, and in the same year building and loan associations in Columbus had as a part of their assets bonds in the sum of $885,000, the large majority of which consisted of government bonds.

The reserve and surplus or undivided profits funds of building and loan associations in the state of Ohio are not taxed. It is the general practice to tax the general shareholder, as distinguished from the borrowing shareholder, upon a valuation of $100 per share, irrespective and independent of reserve and surplus. This exemption from taxation of reserve and surplus, excepting, however, the portion thereof that is invested in business buildings and real estate, which of course is taxed as real estate, exists irrespective of whether the funds are evidenced by tax exempt securities or otherwise. Likewise, borrower's stock is not subject to taxation under the law. Gen. Code § 9675. This would seem to make very little difference, however, as in general practice the borrower's investment in stock, in a large majority of cases, is only a fractional part of par. All other stock, save and except the so-called borrower's stock, though taxed upon a valuation of par in practice, is only taxed as a credit; that is, the individual owning the stock may deduct legitimate debts from its value, and the remainder, if any, is legally taxable. In this connection it appears that a large majority of the stock of building and loan associations, in this wise subject to taxation, is not returned for taxation.

Five mortgage loan companies doing business in the city of Columbus have invested capital of nearly four and one-half millions of dollars, while fourteen of such companies in Cleveland, have an aggregate invested capital of over seventeen millions. While mortgage loan companies in Columbus in the year 1926 had a mortgage business of nearly three millions of dollars, of that amount something less than 25 per cent. was first mortgage business, the remainder being second mortgages. In 1927 the proportion of first mortgage business materially in-

creased, and that of second mortgage business decreased. First mortgage loans were made by these companies for terms from three to five years, and in some cases for shorter periods. Two of the Columbus mortgage loan companies did only a first mortgage business. Two of the mortgage companies in 1926 had as part of their assets about three quarters of a million of dollars in government bonds, which were not assessed or assessable for taxation. Other similar companies in Cleveland held large amounts of such tax free bonds.

In 1927 there were forty-six finance companies in Ohio engaged in the business of discounting automobile paper, with an aggregate invested capital of fifteen millions of dollars. The year previous the invested capital was about 25 per cent. less. Six of these companies did business in the city of Columbus in 1926 (four of which, with legal domiciles in the county outside the city, had a combined invested capital of over two and a quarter millions of dollars. The business of finance companies doing business in Columbus and elsewhere in the state was that of making small loans on chattel mortgage security, and discounting automobile and other commercial paper secured by chattel mortgage, the six Columbus companies doing a business of more than a million and a quarter dollars in direct loans, and more than three and a quarter million dollars in discount loans. Four of the finance companies having their principal accounting offices and doing business in Columbus, had their legal domiciles in Marion township, outside the city, where the tax rate in 1926 was $11.10 per thousand. Those companies returned over $1,300,000 for taxation. If taxes had been paid upon the rate in the city of Columbus ($20.60 per thousand), the amount of the taxes would have been substantially double.

National banks are agencies of the federal government. The congress has committed to the respective states the right and authority to tax national banks doing business within their territorial limits, but only in the modes and under the limitations set out and provided in Rev. St. § 5219 (12 USCA § 548). Des Moines National Bank v. Fairweather, 263 U. S. 103, 44 S. Ct. 23, 68 L. Ed. 191. The Ohio state legislature has elected (sections 5408, 5411, 5412, Gen. Code) to tax national banks within the state of Ohio, under subsection 1(b) of the federal act. The mode therein set out is the taxation of the shares of stock of the bank under the restrictions that: "The tax imposed shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State coming into competition with the business of national banks." "Moneyed capital," however, by the terms of the statute, does not include bonds, notes, or other evidences of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business, and representing merely personal investments not in competition with the banking business.

The Supreme Court of the United States has had occasion from time to time, in issues presented to it, to construe the above provision of the federal act, and this has been especially true within recent years. It has repeatedly held that moneyed capital of national banks in competition in substantial amounts with other moneyed capital used in the investment and banking business must, under the federal restrictions of the act, be taxed substantially at the same rate. Merchants' National Bank v. City of Richmond (Va.) 256 U. S. 635, 41 S. Ct. 619, 65 L. Ed. 1135; First National Bank v. Anderson (Iowa) 269 U. S. 341, 46 S. Ct. 135, 70 L. Ed. 295; First National Bank v. Hartford (Wis.) 273 U. S. 548, 47 S. Ct. 462, 71 L. Ed. 767, 59 A. L. R. 1; Minnesota v. First National Bank (Minn.) 273 U. S. 561, 47 S. Ct. 468, 71 L. Ed. 771; Commercial National Bank v. Custer County (Mont.) 275 U. S. 502, 48 S. Ct. 155, 72 L. Ed. 395; Montana National Bank v. Yellowstone County (Mont.) 276 U. S. 499, 48 S. Ct. 331, 72 L. Ed. 673.

In the Virginia case (Merchants' National Bank v. City of Richmond, 256 U. S. 635, 41 S. Ct. 619, 620, 65 L. Ed. 1135), the principle is announced (syllabus 3) that the words "moneyed capital in the hands of individual citizens," includes bonds, notes, and other evidences of indebtedness in the hands of individuals, which are shown to come materially into competition with the national banks in the loan market. And later in the opinion it is said: "It has become established that while the words 'moneyed capital in the hands of individual citizens' do not include shares of stock in corporations that do not enter into competition with the national banks, they do include something besides shares in banking corporations and others that enter into direct competition with those banks. They include not only moneys invested in private banking, properly so called, but investments of individuals in securities

that represent money at interest and other evidences of indebtedness such as normally enter into the business of banking"—citing Evansville Nat. Bank v. Britton, 105 U. S. 322, 324, 26 L. Ed. 1053. And further quoting from the case of Mercantile Bank v. New York, 121 U. S. 138, 7 S. Ct. 826, 30 L. Ed. 895, it is said: "The terms of the act of Congress, therefore, include shares of stock or other interests owned by individuals in all enterprises in which the capital employed in carrying on its business is money, where the object of the business is the making of profit by its use as money."

The opinion calls attention to the fact that the reasoning in the Britton and New York Cases was followed by the court in New York ex rel. Amoskeag Savings Bank v. Purdy, 231 U. S. 373, 390, 34 S. Ct. 114, 58 L. Ed. 274. This same interpretation of Rev. St. § 5219, says the court, has been consistently adhered to by the Supreme Court in cases where such moneyed capital comes into competition with that of national banks. Attention was also called to the fact that, in Bank of Commerce v. Seattle, 166 U. S. 463, 464, 17 S. Ct. 996, 41 L. Ed. 1079, the precise ground of decision was the want of a showing that "the moneyed capital left unassessed was, as to any material portion thereof, moneyed capital coming into competition with that of national banks." Likewise, it was said, to the same effect is First Nat. Bank of Wellington v. Chapman, 173 U. S. 205, 219, 19 S. Ct. 407, 43 L. Ed. 669.

In the First National Bank v. Anderson, 269 U. S. 342, at page 347, 46 S. Ct. 135, 138, 70 L. Ed. 295, the court says: "The purpose of the restriction [Federal Act] is to render it impossible for any state, in taxing the shares, to create and foster an unequal and unfriendly competition with national banks, by favoring shareholders in state banks or individuals interested in private banking or engaged in operations and investments normally common to the business of banking. And on page 348 of 269 U. S., 46 S. Ct. 135, 138: "Moneyed capital is brought into such competition where it is invested in shares of state banks or in private banking, and also where it is employed, substantially as in the loan and investment features of banking, in making investments, by way of loan, discount or otherwise, in notes, bonds or other securities with a view to sale or repayment and reinvestment."

This case holds that the investment of individual capital in farm mortgages is not in-

consistent with its being used in competition with national banks. This is true, it is said, because the prohibition against loans on real estate by national banks has been withdrawn, and that authority has been granted by congress.

In First National Bank v. Hartford, 273 U. S. 549, 47 S. Ct. 462, 71 L. Ed. 767, 59 A. L. R. 1, the court found that the evidence before it in that case showed substantial competition with national banks, by untaxed capital in the business of making loans and selling credits, and also by capital of private individuals, who as investors of surplus funds were engaged in lending money at interest on real estate mortgages, and other evidences of indebtedness normal to banking. And that, to establish the fact of competition, it is not necessary that the same customers are solicited for the same loans or investments, but, if both are in the business of seeking and securing investments of the same class in the same locality, which are substantial in amount, the statutory restriction applies. Also, real estate mortgages acquired by way of loan or discount come within the same inhibition.

The Minnesota case (Minnesota v. First National Bank, 273 U. S. 561, 47 S. Ct. 468, 469, 71 L. Ed. 774) says in effect, upon the subject of competition, that shares of corporations using their capital in the note brokerage business are "moneyed capital in the hands of individual citizens," and this competition may arise by the use of capital, in a business, even though the competition be with some, but not all, phases of the business of national banks.

In the case before this court, we have the plaintiff banks engaged in the usual and ordinary types of general banking, in the business of loaning money directly in large and substantial amounts on mortgage security; other considerable amounts, in which mortgages are held as collateral; and, further, large amounts upon the faith of financial statements, in which real estate becomes an important element; receiving deposits from customers, paying interest on time deposits, discounting commercial paper, including material amounts of automobile paper. We find in the same city, and in the same business district, building and loan associations, some of them housed in financial edifices constructed as financial institutions, engaged in the business of loaning money on real estate, both of residence and business classes; some loans termed straight or direct loans, due in a term of years, and others, a majority

amount, payable on the amortized or installment plan. The same institutions advertise for and receive time deposits, under the passbook plan and under the certificate of deposit plan, and pay out moneys on the demand of depositors. The mortgage companies are in the business of loaning their funds for profit on mortgage security, and in considerable aggregates on first mortgage. The finance companies doing business in the same city, as a material and substantial part of their business, discount commercial paper, and particularly that type known as automobile paper.

Applying these facts to the principles laid down in the above-cited cases, there is place for only one conclusion, and that is that the moneyed capital mentioned above, of the Columbus building and loan associations, mortgage companies, and finance companies, are in direct competition in very substantial amounts, with much of the moneyed capital of the plaintiff national banks.

The other demand of the statute is that the national bank shares shall not bear a greater rate of taxation than is assessed on other moneyed capital in the hands of individual citizens. In the Virginia case, supra, the state statute and city ordinance authorized a tax upon bank stock, state and national, at a certain rate, and intangible personal property, including bonds, notes, and other evidences of indebtedness, at a materially lower rate. The decision held that these legislative acts were invalid, as being contrary to the proper legal interpretation of the federal act (Rev. St. § 5219). The court dealt with the decision in Boyer v. Boyer, 113 U. S. 689, 691, 5 S. Ct. 706, 28 L. Ed. 1089, wherein the court in that case found a discrimination against national bank shares in favor of moneyed capital invested in state bank stock. But the Virginia decision, while approving that conclusion, says that to confine the construction of Rev. St. § 5219 to the interpretation that the discrimination is limited to state bank stock is too narrow, and quote with approval from the case of Evansville Bank v. Britton, 105 U. S. 322, 324, 26 L. Ed. 1053, as follows: "We are of opinion that the taxation of bank shares by the Indiana statute, without permitting the shareholder to deduct from their assessed value the amount of his bona fide indebtedness, as in the case of other investments of moneyed capital, is a discrimination forbidden by the act of Congress."

In the later decision of First National Bank v. Anderson, 269 U. S. 341, on page 348 of the opinion, 46 S. Ct. 135, 138, 70 L. Ed. 295, it is said: "The restriction [as to rate] is not intended to exact mathematical equality in the taxing of national bank shares and such other moneyed capital, nor to do more than require such practical equality as is reasonably attainable in view of the differing situations of such properties. But every clear discrimination against national bank shares and in favor of a relatively material part of other moneyed capital employed in substantial competition with national banks is a violation of both the letter and spirit of the restriction." See People of State of New York ex rel. Williams v. Weaver, 100 U. S. 539, 25 L. Ed. 705; Boyer v. Boyer, 113 U. S. 689, 701, 5 S. Ct. 706, 28 L. Ed. 1089; First National Bank of Wellington v. Chapman, 173 U. S. 205, 216, 19 S. Ct. 407, 43 L. Ed. 669.

In the Wisconsin case (First National Bank of Hartford v. City of Hartford, 273 U. S. 548, 47 S. Ct. 462, 71 L. Ed. 767, 59 A. L. R. 1) the state statute provided for an ad valorem tax upon all shares of banks as personal property within the assessment district in which the bank was located. Another section of the taxing act exempted moneys, debts due or about to become due, and all stocks and bonds. The court in that case held that there was a discrimination forbidden by Rev. St. § 5219, and that the requirement of that section of approximate equality in taxation is not limited to moneyed capital invested in state banks, or to competing capital employed in private banking, but that it applies wherever capital, substantial in amount compared with the capitalization of national banks, is employed in a business or by private investors, in the same sort of transactions as those in which national banks engage, and in the same locality in which they do business, and the fact that the discrimination is not unfriendly or hostile does not render Rev. St. § 5219 inapplicable. And on page 560 of 273 U. S., 47 S. Ct. 462, 466, it is stated: "But a consideration of the entire course of judicial decision on this subject can leave no doubt that state legislation and taxing measures which by their necessary operation and effect discriminate against capital invested in national bank shares in the manner described are intended to be forbidden."

In the Minnesota case (Minnesota v. First National Bank, 273 U. S. 561, 47 S. Ct. 468, 71 L. Ed. 774) the court had under consideration the statutes of Minnesota wherein national bank shares and moneyed capital of banks or mortgage loan companies were assessed

40 per cent. of their full value, in the district where located, while money and credits were taxed at the rate of three mills on the dollar of their full cash value, and mortgages upon real estate and executory contracts for the sale of real estate were taxed at a lower rate. The court found the operation of these statutes to be discriminatory against national bank shares, and that the discrimination was not removed in practice by deducting liabilities of the bank from its assets in valuing its shares, while allowing no deduction from their liabilities to individuals in valuing their credits.

The substantial discrimination against the shares of the plaintiff's national banks and other national banks in the instant case is equally discernible upon an analysis of the evidence adduced, as in the cases discussed above. The aggregate reserve and undivided profits funds of building and loan associations of the city of Columbus and elsewhere in the state, in the years with which we are concerned, were not taxed to either the associations or their shareholders, except in the instances where portions of those funds were invested in office buildings or other real property. Like funds of the national banks were taxed. Borrower's stock in building and loan associations, as has been stated, is not taxable under the law. Running stock, paid up stock, and permanent stock of building and loan associations, while taxed in the name of the individual stockholders, are taxed only as credits, against which the debts of the taxpayer may be deducted. While the record shows substantial amounts escaping taxation, it also shows amounts returned for taxation deducting substantial amounts in the way of debts.

With no less clarity is shown the discrimination against plaintiff's bank shares and those of other national banks, in favor of individuals holding shares in mortgage loan companies and finance companies. These companies are assessed for taxation on the value of their respective assets, and any tax exempt securities that they may hold escapes taxation. Another type of discrimination is found in the practice of these concerns in fixing their legal domiciles in townships outside the cities in which they do business, where the tax rate is approximately 50 per cent. of the tax rate in the city.

 From the evidence in this case, the conclusion is reached that under the laws of Ohio and the practices of the tax-levying officials, there has been and was in the years 1926 and 1927 substantial discrimination against much of the moneyed capital invested in the shares of stock of the plaintiff's banks, and in favor of competing moneyed capital invested in building and loan associations, mortgage companies, and finance companies, and their individual stockholders.

Just equality in taxation of national banks has been denied, perhaps because an old taxing system has not kept apace in its development with the development of modern business. The mortgage loan company and the finance company of to-day are the creations of the modern business activities in very recent years. The building and loan associations, with all the appointments of up-to-date financial institutions, are altogether different concerns from the old community mutual building and loan association such as was dealt with in the case of Mercantile National Bank v. Hubbard (C. C.) 98 F. 465. The taxes levied against the shares of the plaintiff's banks, which were placed upon the duplicates of Franklin county by the auditor and certified to the defendant treasurer for collection, under the findings made herein and under the principles laid down in the cited cases, are invalid, being assessed and levied contrary to the provisions and inhibitions of Rev. St. § 5219 of the United States.

The bills of complaint allege that the plaintiff banks are ready and willing to pay the amount of taxes that may be found to be just and equitable. This they should of course do under any reasonable conception of equity and right. The question of equitable amount is not before the court in this proceeding, at least up to this stage of its development. Whether there is a jurisdiction under the broad equity powers of the court by which further proceedings may develop the proper amount of taxes that should be allowed and paid is perhaps surrounded with considerable doubt. However, the court is open, with any jurisdiction that it may possess, for that purpose.

The conclusions herein arrived at will mean an approval and confirmation of the findings of fact and conclusions of law reported by the special master, and the granting of the permanent injunction asked in the prayer of the bill. The costs, including an allowance to be made to the special master as compensation for his services, will be divided and assessed equally against the plaintiffs and the defendant.