HOENIG, County Treasurer, v. HUNTINGTON NAT. BANK OF COLUMBUS et al.

No. 6001.

Circuit Court of Appeals, Sixth Circuit. June 29, 1932.

TUTTLE, District Judge, dissenting.

Clarence D. Laylin, of Columbus, Ohio (Donald J. Hoskins, Eugene Carlin, and Robert J. Odell, all of Columbus, Ohio, on the brief), for appellant.

John Weld Peck, of Cincinnati, Ohio, and J. M. Hengst, of Columbus, Ohio (Peck, Shaffer & Williams, of Cincinnati, Ohio, and James M. Hengst, of Columbus, Ohio, on the brief), for appellees.

Before HICKS and HICKENLOOPER, Circuit Judges, and TUTTLE, District Judge.

HICKENLOOPER, Circuit Judge.

This cause presents for determination the question whether Rev. St. § 5219 as amended (12 USCA § 548) has been violated in respect of the assessment of local taxes upon the shares of stock of three national banks in the city of Columbus, Ohio, for the years 1926 and 1927. Such banks are instrumentalities of the federal government, and neither their assets nor the shares of their capital stock may be subjected to property taxes except by and with the consent of the federal government. The applicable condition upon which this consent is given is printed in the margin.[1] The District Court held this condition to have been breached and issued a permanent injunction. 45 F.(2d) 213. The defendant appeals.

The restriction imposed upon the power of the state to tax the shares of stock of a national bank is concerned only with that part of moneyed capital in the hands of individual citizens of the state which comes "into competition with the business of national banks." Its main purpose is to prevent "an unequal and unfriendly competition with national banks, by favoring shareholders in state banks or individuals interested in private banking or engaged in operations and investments normally common to the business of banking." First National Bank v. Hartford, 273 U. S. 548, 558, 47 S. Ct. 462, 71 L. Ed. 767, 59 A. L. R. 1; First National Bank v. Anderson, 269 U. S. 341, 347, 348, 46 S. Ct. 135, 138, 70 L. Ed. 295; Des Moines National Bank v. Fairweather, 263 U. S. 103, 116, 44 S. Ct. 23, 68 L. Ed. 191; Mercantile Nat. Bank v. New York, 121 U. S. 138, 155, 7 S. Ct. 826, 30 L. Ed. 895. Obviously this discrimination may be practiced as well by applying unequal and discriminatory rules for

[1] "In the case of a tax on said shares the tax imposed shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State coming into competition with the business of national banks: Provided, That bonds, notes, or other evidences of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall not be deemed moneyed capital within the meaning of this section."

the valuation of property (Des Moines National Bank v. Fairweather, supra; Whitbeck v. Mercantile National Bank, 127 U. S. 193, 198, 8 S. Ct. 1121, 32 L. Ed. 118; New York v. Weaver, 100 U. S. 539, 545, 25 L. Ed. 705), as by taxing the shares of stock of national banks at higher rates than are applied to other moneyed capital, as in Minnesota v. First National Bank, 273 U. S. 561, 47 S. Ct. 468, 71 L. Ed. 774; First National Bank v. Anderson, supra, and other cases where the discrimination was the indirect outgrowth of a general change in the system of taxation of the state from that of ad valorem taxes to one of an income tax; but before the tax upon the shares of stock of a national bank may be held invalid it must appear not only that other moneyed capital, within the definition uniformly adopted by the Supreme Court, is favored by a lighter burden of taxation than that imposed upon bank stock, but also that the manner in which such other moneyed capital is employed brings it into direct and substantial competition with the business of national banks. A similarity of investment use must be shown, for it is from the manner of use that competition arises, if at all, in the sense intended. First National Bank v. Hartford, supra, 273 U. S. 557, 558, 47 S. Ct. 462, 71 L. Ed. 767, 59 A. L. R. 1.

In the instant case, it is claimed that competition with national banks exists in the manner in which building and loan associations lend money on mortgage and on collateral security, and receive deposits payable on demand, constructing and equipping their offices or counting rooms in semblance to those of banks; and in the manner in which mortgage companies and finance companies, organized under the Ohio law, loan money on mortgage of real estate, chattel mortgage, or collateral security, and discount or deal in commercial paper and installment contracts. In respect of building and loan associations, it is said that discrimination exists in that the owners of the stock of these associations are permitted to deduct their debts from the face value of the stock in returning it for taxation; in that the stock is not taxed at the source, and thus much of it is not returned by the owners and wholly escapes taxation; in that, if returned at all, it is returned at the owner's domicile, and such domicile may be in a low tax rate district; and in that the accumulated surplus and undivided profits are not taxed at all. In respect of finance and mortgage companies, the claim of discrimination is founded upon the fact that these companies are permitted to select corporate domiciles at the time of incorporation, and that these technical domiciles need not be, and frequently are not, where the company actually does business, but in districts having a very much lower tax rate; and upon the fact that, in making return upon their assets for taxation purposes, such companies are permitted to deduct the value of any nontaxable securities they may hold (principally shown to be Liberty bonds).

*As to Building Associations:* The tax laws of Ohio, in practically the same form as those with which we are here concerned, were held not to be discriminatory as against the owners of shares in national banks in First National Bank v. Chapman, 173 U.S. 205, 213, 19 S.Ct. 407, 43 L.Ed. 669. This case recognizes and reaffirms so much of the doctrine of Mercantile Nat. Bank v. New York, supra, as holds that savings banks do not come into competition with national banks, and justifies the exemption of the moneyed capital in the possession of savings banks, including deposits, upon the ground of a sound public policy to promote an accumulation of savings by the industrious and thrifty. The fundamental distinction between the generally noncommercial purpose of the savings bank and the distinctly commercial character of national banks was recognized. In People of State of New York v. Commissioners, 4 Wall. 244, 18 L. Ed. 344, the same principle was applied in regard to insurance companies, which admittedly employ moneyed capital in much the same way as national banks, in the purchase of investments, in the making of loans upon collateral security or that of the reserve value of the policies of insurance, and upon mortgage of real estate, and the like; and in Mercantile National Bank v. Hubbard (C. C.) 98 F. 465, the identical doctrine was applied to Ohio building associations by Mr. Chief Justice Taft, then Circuit Judge. Judge Taft there says (page 471 of 98 F.): "It seems to me that building associations are certainly not to be differentiated in their purpose or object, or practical effect, from savings banks, and that the capital invested in them, though subject to a somewhat different rule of taxation, cannot be regarded as moneyed capital in competition with the moneyed capital in national banks, any more than is capital invested in savings banks;" nor, we might add, from that invested in or possessed by insurance companies. This conclusion seems implicit in the very nature of the building association. The case was later affirmed by the Supreme Court. Sub nomine Lander v. Mercantile Nat. Bank, 186 U. S. 458, 22 S. Ct. 908, 46 L. Ed. 1247.

It is insisted, however, that the present day building association is a very different type of institution from the "small, neighborhood, mutual associations of Judge Taft's time," and emphasis is laid upon the construction of offices in similitude to those of banks, the competition for deposits, the payment of deposits on demand, and the making of loans upon collateral security. We do not think that the general nature of the business of building associations has so far changed as to make the law established by the above-cited cases inapplicable. Compare United States v. Cambridge Loan & Bldg. Co., 278 U. S. 55, 49 S. Ct. 39, 73 L. Ed. 180. The chief purpose of these institutions is still "to encourage the building of small houses by poor people, and the saving from their earnings, week by week, of an amount sufficient to pay the mortgage debts incurred in the purchase of the land and the construction of the house." Mercantile National Bank v. Hubbard, supra (C. C.) 98 F. 465, 471. Practically all loans are of the amortized type in which payment is spread over a period of from ten to twelve years. National banks perhaps might, but as a matter of fact do not, and in the interest of good banking should not, invest their funds generally in this manner. The two types of institutions have essentially different characteristics; the one is purely commercial in character, in which the assets must be kept liquid; the other is sui generis, noncommercial, and without a comparable need for liquid assets. The one is founded and conducted upon banking principles; the other was created in answer to a need which the banks could not and did not satisfy, and in furtherance of a wholesome public policy to promote building, especially the building of homes, and to develop the habit of thrift.

It is quite true that national banks, subject to certain restrictions, are now permitted to loan money upon the security of real estate mortgages, and that the plaintiffs below had taken advantage of this privilege. It is also true that building associations have invested some of their funds in Liberty bonds, and, to a very limited extent, may have made a few investments of idle capital in collateral loans or so-called "straight" mortgages. But we cannot concede that even as to these investments the building associations are in substantial competition with national banks, or that, as claimed by plaintiffs below, the mere facts that money is loaned by building associations upon promissory notes, at interest and to be repaid in money, and that national banks take the ownership of real estate into consideration in passing upon the credit standing of borrowers, necessarily bring the two classes of institutions into competition. In the broad economic sense this may be so, but it was equally so when People of State of New York v. Commissioners, Mercantile Nat. Bank v. New York, First National Bank of Wellington v. Chapman, and Mercantile National Bank v. Hubbard (Lander v. Mercantile Nat. Bank) were decided. In those cases the fundamental and substantial differences between commercial institutions, such as national banks, and institutions of the insurance company, savings bank, and building association types, were the real bases of the finding of want of competition; and our decision of the present issue is founded upon a recognition of these same differences. Compare, also, Georgetown National Bank v. McFarland, 273 U. S. 568, 47 S. Ct. 467, 7 L. Ed. 779.

The scheme of taxation as it existed in Ohio in 1926 and 1927 (it has now been supplanted by an entirely different system) was fair to national banks and did not discriminate, in any broad conception of its application, in favor of other moneyed capital coming into direct competition with the business of such banks; and we do not think that a possible specific exception or two, in obvious departure from the accepted and general rule governing the business of the building association, should be held to nullify the clear intent of Congress, that national banks should bear their fair proportion of the tax burden, or to effect a virtual exemption of all national banks from taxation. Compare Amoskeag Savings Bank v. Purdy, 231 U. S. 373, 34 S. Ct. 114, 58 L. Ed. 274. We do not feel that the authority of the earlier cases above cited has been weakened by those later decisions invalidating taxes levied upon national banks at different and actually higher rates than those imposed upon all other moneyed capital admittedly in competition with the banks; or that different rules have been adopted by the Supreme Court for determining what constitutes substantial competition by the cases of First National Bank v. Anderson, supra; First National Bank v. Hartford, supra; Minnesota v. First National Bank, supra; and Iowa-Des Moines National Bank v. Bennett, 284 U. S. 239, 52 S. Ct. 133, 76 L. Ed. 265.

As to the alleged "competition for deposits," it is evident from the universal expressions of opinion by the Supreme Court that competition, in the sense intended, is limited to the employment of moneyed capital "substantially as in the loan and investment

features of banking." Deposits constitute moneyed capital, but national banks are not taxed upon their deposits any more than are savings banks and building associations; and we are here primarily concerned only with what is done with such moneyed capital after it is secured, not with competition to obtain it. There is clearly no distinction in law between the competition for deposits as between national banks and savings banks, and the same competition as between national banks and building associations. Thus Mercantile Nat. Bank v. New York, supra, seems directly in point on this issue.

*As to Finance and Mortgage Companies:* What we have said as to building associations applies with equal force, we think, to finance and mortgage companies. These institutions were the outgrowth of a need created largely by installment selling and low credit rating of purchasers in the mercantile world; a need which could not be satisfied by national banks. The premiums exacted, and the tremendous, though legally permissible, interest charges, discounts, etc., but reflect the attending risks and the element of nuisance in collection. No one who had sufficient credit to borrow from a national bank would submit to the exorbitant charges imposed. On the other hand, a national bank would not purchase installment contracts or undertake the collection of the weekly or monthly payments upon an automobile, refrigerator, or set of furniture. Neither would a national bank lend upon second mortgage of real estate or chattel mortgage of these now so-called necessities, nor extend credit to the ordinary purchaser who must buy on the installment plan. A national bank may, and doubtless often does, extend credit to a mercantile corporation upon security, in part at least, of these installment contracts or "automobile paper"; or a national bank may, and doubtless often does, lend money to the stronger finance and mortgage companies upon like security. But these investments, whether exceptional or usual, are not in competition but, in the latter case, at least, in co-operation with the finance and investment companies. Competition requires a similarity in the nature of the transaction, and this is here lacking.

The evidence discloses the fact that some of the mortgage companies are engaged almost exclusively in procuring mortgages of the better type which are then sold to insurance companies or other financial institutions. Others do this to a greater or less extent. In so doing we regard these mortgage companies as in a very true sense the agencies of such other institutions in making the loans, and if such institutions are not in competition with national banks, and certainly insurance companies are not, we do not regard this established practice whereby they secure their loan investments as being in such competition. Premiums, discounts, and higher interest charges also enter into these transactions, else there would be no profit for the mortgage company. The same radical differences in nature and business practice exist as regards these mortgage and finance companies as was noticed in respect of building associations, and it is only by holding that anything which is a "loan," and which takes the question of credit anywise into consideration, whether due to an established business, net worth, or the value of the collateral pledged, is necessarily a transaction in competition with national banks, which also make loans or advance money upon credit, that we can find the existence of competition.

But were the moneyed capital of finance and mortgage companies properly regarded as in competition with national banks, it would still seem that no discrimination in taxation exists as against them. The discrimination urged by appellees is: (1) That these mortgage and finance companies are permitted to deduct the value of their holdings of Liberty bonds or other nontaxables in making returns for taxation; and (2) that they may and do select their corporate domiciles in low tax rate districts. The decision in Des Moines National Bank v. Fairweather, 263 U. S. 103, 117, 44 S. Ct. 23, 68 L. Ed. 191, is sufficient answer to the first contention, although, had the same distinction been applied to state banks, the law could not be upheld. Montana Nat. Bank v. Yellowstone County of Montana, 276 U. S. 499, 48 S. Ct. 331, 72 L. Ed. 673. The second contention made is more novel, and deserves special consideration.

The statutes of Ohio governing the granting of charters to corporations for profit require that the articles of incorporation shall state "the place where it is to be located, or its principal business transacted." General Code, § 8625. Where the corporation owns real estate in Ohio, the valuation of personal property to be taxed "shall be apportioned by the [county] auditor to such cities, villages, townships, or taxing districts, pro rata, in proportion to the value of the real estate and fixed property included in the return." General Code § 5405. But when no such real estate is owned, the place designated in the articles of incorporation as its location or principal place of business is regarded as its

corporate domicile, and tax returns are to be filed there, regardless of the fact that business may be transacted elsewhere. State ex rel. v. Zangerle, 117 Ohio St. 436, 159 N. E. 823.

While the practical operation of the statutes of Ohio, as construed by the highest court of that state, permits any domestic corporation to acquire a legal domicile for taxation purposes in a taxing district other than that of the location of its principal office, this right has been existent from the very earliest time. It was recognized by the Supreme Court of Ohio at least as early as 1882 (Pelton v. Transportation Co., 37 Ohio St. 450), and is but a variation of the right of every individual to select his own domicile, or the right of incorporators to incorporate under the laws of any state. Rev. St. § 5219, as amended and before, restricts taxation of the shares of stock of a national bank to "the taxing district where the association is located and not elsewhere," and thus makes that place the unvariable situs for taxation of national bank shares. Otherwise expressed, it may be said that this provision also creates a legal domicile of the shareholder for the taxation of his shares under the doctrine of mobilia sequuntur personam. It is a recognition of the right of the sovereign to lawfully provide for the creation of such domicile, and we think that the fact that tax rates differ in different localities within the state must also have been known to Congress.

When the above facts are taken into consideration, we think that the restrictions upon the right of the state to tax national bank stock at a rate not greater than is assessed upon other moneyed capital in the hands of individual citizens can only be taken to apply to the rates assessed against both when lawfully domciled in the same taxing district. So far as we know, the point has never been raised or decided before, and the fact that the individual has always been allowed to select his own domicile, and the many years during which this right has been accorded to Ohio corporations, make the lack of adjudication of the point strongly persuasive of its lack of merit in the opinion of the bench and bar. The situation is omnipresent, at least as to individuals, in every state of the Union. We do not regard it as a discrimination within the intent of section 5219, as amended.

For the reasons above stated, we are of the opinion that the injunction restraining the collection of the taxes was improvidently issued, and the decree of the District Court is accordingly reversed, and the cause is remanded for further proceedings consistent with this opinion.

TUTTLE, District Judge (dissenting).

I cannot concur in the conclusions reached by a majority of the court. It seems to me quite clear that the record in this case, viewed in the light of the applicable decisions of the Supreme Court, shows not only direct and substantial competition with national banks by "other moneyed capital," within the meaning of section 5219 of the Revised Statutes, as amended, but also the discrimination against such banks forbidden by that section.

The questions presented here involve two separate and distinct considerations: (1) Competition; (2) discrimination. These will be discussed in turn, in that order.

(1) The Supreme Court has many times, and in no uncertain terms, defined and explained the meaning, purpose, and effect of this statute, and pointed out the principles by which it is to be construed and applied. Thus, in Mercantile National Bank v. New York, 121 U. S. 138, at page 155, 7 S. Ct. 826, 835, 30 L. Ed. 895, the court said: "The business of banking, as defined by law and custom, consists in the issue of notes payable on demand, intended to circulate as money where the banks are banks of issue; in receiving deposits payable on demand; in discounting commercial paper; making loans of money on collateral security; buying and selling bills of exchange; negotiating loans, and dealing in negotiable securities issued by the government, state and national, and municipal and other corporations. These are the operations in which the capital invested in national banks is employed, and it is the nature of that employment which constitutes it, in the eye of this statute, 'moneyed capital.' Corporations and individuals carrying on these operations do come into competition with the business of national banks, and capital in the hands of individuals thus employed is what is intended to be described by the act of congress. * * * The terms of the act of congress, therefore, include shares of stock or other interests owned by individuals in all enterprises in which the capital employed in carrying on its business is money, where the object of the business is the making of profit by its use as money. The moneyed capital thus employed is invested for that purpose in securities by way of loan, discount, or otherwise, which are, from time to time, according to the rules of the business, reduced again to money, and reinvested."

In First National Bank v. Anderson, 269 U. S. 341, at page 348, 46 S. Ct. 135, 138, 70 L. Ed. 295, it was said: "Moneyed capital is brought into such competition where it is invested in shares of state banks or in pri-

vate banking, and also where it is employed, substantially as in the loan and investment features of banking, in making investments, by way of loan, discount or otherwise, in notes, bonds or other securities with a view to sale or repayment and reinvestment."

In First National Bank v. Hartford, 273 U. S. 548, at pages 553–559, 47 S. Ct. 462, 464, 71 L. Ed. 767, 59 A. L. R. 1, the court discussed and applied the statute in language which included the following: "The evidence shows that plaintiff in the course of its business receives deposits, loans money, has a savings department, deals in exchange, buys and sells notes, government and other bonds, discounts commercial paper and acquires real estate mortgages by loan and purchase. There are real estate firms engaged in lending money to individuals in the vicinity of plaintiff's banking house. According to the testimony, the making of these loans affords the same competition to plaintiff as loans made by banks. And similar conditions obtain throughout the state. There are various individuals, copartnerships, and corporations in the vicinity engaged in the business of acquiring and selling notes, bonds, mortgages and securities. Substantial capital is employed in their business. Competition may exist between other moneyed capital and capital invested in national banks, serious in character and therefore well within the purpose of section 5219 [12 USCA § 548], even though the competition be with some but not all phases of the business of national banks. Section 5219 is not directed merely at discriminatory taxation which favors a competing banking business. Competition in the sense intended arises not from the character of the business of those who compete but from the manner of the employment of the capital at their command. It was intended to prevent the fostering of unequal competition with the business of national banks by the aid of discriminatory taxation in favor of capital invested by institutions or individuals engaged either in similar businesses or in particular operations or investments like those of national banks. Our conclusion is that section 5219 is violated wherever capital, substantial in amount when compared with the capitalization of national banks, is employed either in a business or by private investors in the same sort of transactions as those in which national banks engage and in the same locality in which they do business. Some of the cases dealing with the technical significance of the term 'competition in this field' were decided before national banks were permitted to invest in mortgages as they now are."

Again in Minnesota v. First National Bank, 273 U. S. 561, at page 568, 47 S. Ct. 468, 469, 71 L. Ed. 774, the court fully considered this subject, and in the course of its opinion used the following language, equally applicable here: "Taken as a whole, the evidence tends to show without material contradiction that there is a large amount of money capital in the state employed in normal banking activities such as loans, purchases and sale of notes, bonds, and real estate mortgages, and that large amounts of capital are invested and reinvested in such securities by individual investors within the state. It is said also that the evidence as to individuals was that large amounts of credits, including bonds, mortgages, and notes, were acquired by individuals by loan or purchase in the state and county, but that there is no evidence tending to show that any of these securities were held or employed by individuals in banking or investment business or in any other business. But, as we have held in First National Bank v. Hartford, the competition guarded against by section 5219 [12 USCA § 548] may arise either from the employment of capital invested in a business, even though the competition be with some, but not all, phases of the business of national banks, or it may arise from the employment of capital invested by institutions or individuals in particular operations or investments like those of national banks. It clearly appears from the evidence, as the court below found, that a large proportion of these investments consisted of investments of individuals out of surplus funds which they were investing and reinvesting in bonds, mortgages, and other evidences of indebtedness and that these transactions or continued activities are such as normally constitute an important part of the business of banking as conducted by respondent and other national banks in Minnesota. There is direct evidence, also, that the investments of individuals in this type of security aggregating large amounts lessens the opportunity for the investment of capital by national banks. That capital of individuals thus seeking investment and reinvestment in competition with the capital in national banks is money capital coming into competition with the business of national banks within the meaning of section 5219 is the effect of our decision in First National Bank v. Hartford, supra [273 U. S. 548, 47 S. Ct. 462, 71 L. Ed. 767, 59 A. L. R. 1], and other cases there considered."

Applying these rules and principles to

the evidence in the present case, it is, in my opinion, manifest that the court below properly found, from such evidence, competition, direct and substantial, between the plaintiff national banks and other moneyed capital in the hands of various corporations known as building and loan associations, mortgage companies, and finance companies, respectively. Commercial National Bank v. Custer County, 275 U. S. 502, 48 S. Ct. 155, 72 L. Ed. 395; Nelson v. First National Bank, 42 F.(2d) 30 (C. C. A. 8); Public National Bank v. Keating, 47 F.(2d) 561 (C. C. A. 2); People ex rel. Morris Plan Co. of Buffalo v. Burke, 253 N. Y. 85, 170 N. E. 502. In summarizing the facts disclosed by the record in this connection, the District Court in its opinion [45 F. (2d) 213, at page 218], among other things, said: "In the case before this court, we have the plaintiff banks engaged in the usual and ordinary types of general banking, in the business of loaning money directly in large and substantial amounts on mortgage security; other considerable amounts, in which mortgages are held as collateral; and, further, large amounts upon the faith of financial statements, in which real estate becomes an important element; receiving deposits from customers, paying interest on time deposits, discounting commercial paper, including material amounts of automobile paper. We find in the same city, and in the same business district, building and loan associations, some of them housed in financial edifices constructed as financial institutions, engaged in the business of loaning money on real estate, both of residence and business classes; some loans termed straight or direct loans, due in a term of years, and others, a majority amount, payable on the amortized or installment plan. The same institutions advertise for and receive time deposits, under the passbook plan and under the certificate of deposit plan, and pay out moneys on the demand of depositor. The mortgage companies are in the business of loaning their funds for profit on mortgage security, and in considerable aggregates on first mortgage. The finance companies doing business in the same city, as a material and substantial part of their business, discount commercial paper, and particularly that type known as automobile paper. * * * There is place for only one conclusion, and that is that the moneyed capital mentioned above, of the Columbus building and loan associations, mortgage companies, and finance companies, are in direct competition in very substantial amounts, with much of the moneyed capital of the plaintiff national banks."

I have carefully examined the voluminous record, and I see no escape from the conclusion that it amply supports the findings of the District Court just quoted, especially when it is borne in mind that national banks are expressly empowered by law (12 USCA § 24) to "exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of this chapter."

To review or discuss the evidence in detail would extend this opinion to undue length. A few specific references, however, to some of the testimony in the record will indicate the nature of the evidence on this subject. For example, the witness Huntington, vice president of the Huntington National Bank of Columbus, testified, in part as follows: "I am moderately familiar with the practices of building and loan associations in Columbus. They are in very much the same business that the banks are. They receive deposits; they allow interest on moneys that the public may leave with them as the banks do; they lend moneys to the individuals or to the public as the banks do; they exercise such other functions as renting deposit boxes; they purchase bonds in the market, banks do the same; they make real estate mortgage loans, banks do the same. The figures of our own banks show that about 50 per cent of our loans are collateral loans, and that of our collateral loans about 10 per cent are made with mortgages as collateral—that would be about 5 per cent of our total loans. We, however, are a city bank and the percentage would be much higher in country banks. A loan might be made on a mortgage as a direct security without the mortgage being made directly to the bank as a mortgagee if it were made to a third person and assigned to the bank. When we make a loan on the mortgage as collateral security the customer comes in and makes his note and pledges as collateral security to that note a mortgage on real estate of which he is the owner. Under those conditions the loan is security in essence by mortgage on real estate in the sense that real estate security is back of the loan; and in making such loans our bank is in competition with the building associations. * * * If an individual or a firm desires to borrow money they may approach by several different avenues to pro-

cure several different parties to secure the loan; they may approach the bank with the statement that they own such and such property including real estate and ask for an unsecured credit or loan. They may also approach a building and loan company and ask for a mortgage loan on their real estate. In such a case the two loans would be in competition though one of them might not contemplate a mortgage at all. It is a common occurrence for an individual to come in and make a statement to our bank and say that he has a stock of goods worth so many dollars and the building in which he has it stored and the residence worth $20,000, and he wants a loan on his name and statement of $5,000. A very good majority of all loans are accompanied by financial statements of the borrowers. That has become a more and more usual practice of the banks in recent years. * * * Building associations in Columbus do not confine themselves to loans on homes. I am not familiar with their country loans, but they do loan on downtown commercial buildings. I know of one instance of a construction loan that has run over $300,000 on North High Street and it is about to be completed. I think the contract is for $330,000. That is a commercial building with store rooms and I believe for hotel purposes above. There is practice among bankers and others to issue bonds against a mortgage upon a major building. It exists in substantial amount. I know that such a bond issue was proposed by a Cleveland house but the building and loan association succeeded in getting the business. When such bonds are issued by national banks, they employ their capital in their purchase. Building and loan associations receive deposits from the public generally as well as from their stockholders. These deposits are on interest, and are handled very much in the same way that a savings bank deposit is handled. The banks, including our bank, now operate savings departments and the depositors receive interest on their deposits. This is a common practice among national banks and state banks and I believe that there is no substantial difference between the business as we conduct it and the business as conducted by building and loan associations. The depositor in a building and loan association has his bank deposit book or certificate of deposit and ordinarily receives his money upon withdrawal upon demand. I have seen advertisements of building and loan associations to the effect that they pay on demand. Finance companies which buy the chattel mortgage notes of those who sell automobiles are in competition with banks because all automobile dealers do business with some bank and they endeavor frequently to finance their operations through their banks. If they are responsible concerns the banks often lend them money not only against their stock of goods but against their receivables. The finance companies do exactly the same thing. The bank frequently takes the pledge of the mortgagee as collateral or the transfer of the mortgage as collateral, just as the finance company does. * *, * We quite frequently lend to home owners directly, small loans of three, six, and five and ten years where the loan is amortized over a longer period, not always by taking a mortgage. The manner in which we do this is that where we know a man quite well and he is building a home either for himself or rental, we often advance him the cost without taking a mortgage; on his integrity, on his promise not to mortgage the property to anyone else, then he pays it out in installments. He executes a judgment note usually for a short period with the understanding that it will be renewed. Of course we have the privilege of taking judgment at the end of any time period if he does not live up to his contract; so that in fact, it is a liquid asset so far as the bank is concerned."

The witness Stein, president of the Ohio National Bank of Columbus, testified, in part, as follows: "I have observed the conduct of the business of the Building Associations in this community in the making of loans. We sometimes loan upon mortgages as collateral security. I would say probably as high as 10 per cent of our loans are made either upon mortgages as collateral securities or upon mortgages direct, the same effect as far as the borrower is concerned. In either event, we look to the property as our security. With regard to loans which are made on name paper involving a very small amount the moral obligation is considered. If it is a substantial amount, we ask for collateral security of a known market value and in the case of corporations or businesses being done on similar lines as corporate lines we vote a line of credit on the security of the corporation doing business. In other words, it is capital and its ability to make money. Every borrower in our bank that borrows more than $1,000 without collateral security must make a financial statement. * * * All the larger building and loan institutions have as commodious quarters as any bank here has and there is absolutely no difference in appearances. They have counters, cages and places for receiving and paying tellers and the like of that. My impression is that they have slightly longer hours than the banks here

in Columbus. To my best knowledge, they receive deposits from the public generally as well as from stockholders, and that in making their loans they transact business with persons other than stockholders. * * * There are some automobile finance companies located here in Columbus. They loan money on automobiles, the time payment plan. A large number of our automobile accounts borrow money on their customer's paper. There is no difference in our transaction in this regard and the transaction of the finance companies. * * * Occasionally we make loans on diamonds as collateral security. We do not loan on furniture. We would loan on cows in the field, not to a very large extent, however. We loan at times on coffee and on tea. We have loaned on peanuts still in the yard. * * * The money is loaned on a bill of lading until the peanuts reach this destination and then they are in the warehouse. I have always considered those very desirable and we are always ready to make them. * * * We are engaged in the business of buying and selling securities and invest a substantial part of our capital in bonds. This is not merely an investment of surplus on idle funds, but is one of the features of the banking business. We do not set aside any particular amount of money for real estate loans or for any department. If a good real estate loan is offered to us and we are satisfied to take it any time we will supply the funds. * * * We have some longer on amortized loans where the payments both as to principal and interest are made in equal monthly installments covering a period from five to ten or fifteen years—not many. We made those loans the same as anybody else would. We take a mortgage, file and record it and the payments are made at the bank at so much a month. In every instance the mortgage is taken in the name of The Ohio National Bank. The note is a straight mortgage note payable so much a month on the principal or so much a period, whatever the arrangement may be. We have some that will run as high as ten years. They are usually small residential loans. There would not be a large number of these."

The testimony of the witness Archer, president of the Commercial National Bank of Columbus, included the following: "We make loans on real estate in our bank, but we have not gone into the real estate work to any extent. We do make loans on real estate mortgages made directly to our bank; also on real estate mortgages when presented to our bank as collateral security by the holders of the same. We make loans on the faith and credit of real estate as disclosed in the financial statements of borrowers from whom no specific mortgages are taken. As to the percentage of such loans, most of our loans, where we get a property statement, are backed by real estate principally. Our loans are made on the faith and credit of this real estate. As to the extent we loan money upon or in consideration of the real estate of borrowers, about half of our loans are collateral loans. I mean stock and bond collateral and the other half, I would say at least 90 per cent on these statements.

The testimony of the witness McCullough, president of the Buckeye State Building & Loan Company, included the following: "The item in our statement 'Savings Accounts' consists of accounts carried on a pass book and any amount from ten cents can be deposited. We receive these from the general public, ordinarily from anybody who comes in and looks respectable and has some money to deposit. They are not required to be stockholders in the institution. We give them a pass book and enter their deposit. * * * We loan money on real estate—improved property for the most part. Oftentimes there are tracts, farm property of which much of it is not improved. There is a house, a great portion of it is not improved. * * * We have loaned on vacant lots. We do not loan on tracts of land that are undergoing development and making streets. We loan on business property and on property that would be in the commercial or business area of the city—on any good substantially improved type of property that we regard as ample security to protect the funds that we let the borrower have. * * * If the borrower so desires the running stock that is issued to him is customarily cancelled in the payment of the loan. * * * On occasions we do make straight loans, that is, loans for a definite period with interest only. The length of a loan of that kind is three years. At the end of three years, we will renew such a loan if the security is satisfactory to us, which in all cases is reviewed and the title is gone into the same as the original. Those straight loans are not confined to improved urban property, but include principally farm lands. * * * It is true that a part of our loans are made on business and downtown property. We call a man's place of business his home. He may be living there. * * * The making of construction loans is one of the substantial features of my business. It is continuous and a great many loans are made for the construction of homes. Roughly, I should say that one-third of the loans are construction loans."

The testimony of the witness Robinson, secretary of the Equity Savings & Loan Company of Cleveland, included the following: "Of our mortgage loans on real estate amounting to $10,324,709.50, all was secured by first mortgages on single and double dwellings or two-family doubles except $250,500, which amount was secured as follows: 13 loans amounting to $170,500; five loans amounting to $80,000 on buildings containing store rooms and living apartments; loans on farms $1,965; other loans secured by government bonds $1,061.53; secured by pledge of savings deposits $7,675. * * * We do not make it a practice to employ part of our moneyed capital when not otherwise required, in the purchase of government bonds. This situation will probably show the justification, cash in banks average balance in banks ending November 30th, 1926, average monthly balance $384,804.60 on which we get from two to four per cent. We have some certificates from banks and the average in the banks for the year ending November 30, 1925, up to and including November 28th, was $795,202.20."

The witness O'Brian, secretary of the American Loan & Savings Association, a building association of Dayton, testified, in part, as follows: "We loan on nothing except mortgage security and on our own pass books and stock certificates. If a stockholder wants any money and his interest period is not nearly around, it is cheaper to borrow on a note and secure it by a pledged pass book than it is for him to forfeit the interest for the whole time, and we encourage him to do that. That is a common practice to building associations. We loan on residence property and, secondly, apartments and mercantile property. We consider a building that has stores downstairs with flats upstairs a good loan if we have idle funds, and if they offered requisite security. I do not think we have any loans on strictly mercantile property. We loan on combination residences and stores, as a grocery and living rooms upstairs."

The witness Caldwell, secretary of the Brunson Savings & Loan Company, a Columbus building and loan association, testified, among other things: "The minimum amount of stock a borrower must hold is $1.00 worth. It would be one-thousandth of a share. Our normal shares are $1,000 par value. * * * We lend on residences, apartments and occasionally on farms. We might have a loan on, say, a store room, not many, we prefer a home. I would say 90 to 95 per cent of our loans are on single and duplex properties."

The testimony of the witness Tuke, president of the Eagle Savings & Loan Association, a building and loan association of Cincinnati, included the following: "We loan on real estate; once or twice we made a few loans on Liberty bonds and we have a few loans on Liberty bonds, and we have a few loans on stock accounts or deposit accounts in our association. We do not loan on any other kind of stock. We loan principally on homes, but we have some apartments and some combinations with store down stairs. We prefer homes and supply them first. Then if we have a surplus, it is put out on other property. We have hardly any property that is exclusively business. I do not remember that we have any gasoline filling stations, but I believe we have a piece of property in Carthage, a large brick building, that has a filling station in front—a business property having a garage and a sales room for automobiles."

The witness Moore, secretary of the Ohio Building & Loan Company of Columbus, testified, in part, as follows: "Our loan stock is a share of stock that is issued to the borrower on which a dollar is deposited when the loan is made. The face value of the certificate is $100—$1.00 being paid down. This is our requirements of a borrower so far as the stock holding is concerned. When we had $624.42 of loan stock outstanding, December 31, 1925, we had mortgage loans of $2,021,340.45. The borrowers of that money were the ones who held this $624.42 of loan stock. The shareholders are the ones who held the paid-up stock and dividends of $7,525.71. * * * We do not require the man who makes a mortgage, who borrows money and subscribes and pays down a dollar, to make any more payments on the stock. We give him the regular rate of interest, whatever that is. When the loan is paid out he gets credit for that—the $1.00 and any accrued dividends on it. Substantially all of these loans are what are now termed amortized loans, primarily on homes, a few loans being on flats or something of that kind. If the money on homes is not going out very fast, we consider a good apartment building, but we give preference to single homes. We have no exclusive business house loans. Some of them are combinations. We have some loans on apartments with perhaps a drug store or beauty parlor down stairs."

The witness Gockenbach, secretary of the Dollar Building & Loan Company of Colum-

490

bus, testified: "The shareholder pays $1.00 down on a $100.00 share. It is optional with him whether or not he completes the payment of the other $99.00. It is the practice to pay $1.00 down at the time of the loan and let it stand at that. Whatever is paid is credited on the loan. The stock bears dividends of 5 per cent and the interest rate on the loan is 7 per cent. * * * We make very small loans on certificates of stock and pass books and the like; if a man wants to save a little interest, and the interest period is about out, we will loan him on his pass book. We do not do any general loaning business on collateral security."

The witness Moody, secretary of the Central Building Loan & Saving Company of Columbus, testified: "We require from a borrower to subscribe for one share of stock, par value, $200.00, on which they pay $1.00 at the time the loan is made. They are not required to pay any more; if they pay any more that is optional with them. We do not have one that has paid any more on it. * * * Of our loans on mortgage securities in the amount of $2,975,000 plus, as of December 31, 1925, all are long time loans except $121,500, which are straight loans for three years; the rest are all monthly payments, and extend over a period of more than ten years until paid up. The dividend rate upon our stock is 5 per cent and that is likewise the interest rate upon our deposits. The loans on stock certificates or pass book security of $55,000 plus are made merely for the accommodation of our depositors, and that is an occasional practice; we would prefer real estate loans to that kind of a loan."

There was other testimony to the same general effect as that to which reference has just been made, and a reading of the entire record appears to me to leave no room for reasonable doubt that the moneyed capital of the building and loan associations, mortgage companies, and finance companies in question was in direct and substantial competition with the plaintiff national banks, within the meaning of section 5219, as amended.

It is apparent from the evidence that the business policies and practices of the building and loan associations here involved are substantially different from those in vogue when the case of Mercantile National Bank v. Hubbard (C. C.) 98 F. 465, on which the opinion of the majority of this court appears to largely rely, was decided. It is plain that any requirements of such associations relative to the making of loans to only stockholders therein were wholly nominal and that in fact no such requirements were insisted upon, but that such loans were made by them as a part of their regular course of business and were as fully commercial as those of any national bank; and there is nothing in this record to indicate that the "chief object" of such associations was "to encourage the building of small houses by poor people, and the saving from their earnings, week by week, of an amount sufficient to pay the mortgage debts incurred in the purchase of the land and the construction of the house," which was considered, by the court in the case just cited (at page 471 of 98 F.), to negative competition between such associations and national banks. Nor does the case of United States v. Cambridge Loan & Building Co., 278 U. S. 55, 49 S. Ct. 39, 73 L. Ed. 180, to which the majority of this court also refers in its opinion herein, seem to me to be applicable here. That case merely defines the meaning of the term "building and loan association," as used in the federal income tax statute, and has no relation nor application to the question whether the capital of such an association may under certain circumstances be considered to constitute moneyed capital in competition with national banks.

(2) It is, in my opinion, equally clear that the Ohio system of taxation here involved, as applied to the plaintiff national banks and to the moneyed capital of the building and loan associations, mortgage companies, and finance companies competing with such banks, results in discrimination in violation of the provisions of section 5219, as amended.

Thus, although shares of stock in a national bank are taxed upon the basis of their true value in money, without the deduction therefrom of any of the indebtedness of the taxpayer, shares of stock in an incorporated building and loan association on which shares such association has made a loan to the owner thereof are not subject to any tax, and such shares on which no such loan has been made are taxed only as credits in the hands of such owner, subject to a deduction therefrom of his indebtedness. That this is discrimination, contrary to the provisions of section 5219, as amended, seems to me to be clear. New York v. Weaver, 100 U. S. 539, 25 L. Ed. 705; Evansville National Bank v. Britton, 105 U. S. 322, 26 L. Ed. 1053. Indeed, the following apparent concession on this point appears in the brief for the appellant: "It is admitted that the law is as laid down by the case of Evansville Bank v. Britton, 105 U. S. 322, 26 L. Ed. 1053, that where the state law permits the deduction of debts from credits without a corresponding deduction permitted to those

who have interests in national banks discrimination exists which if it be shown to be substantial, i. e., to involve competing moneyed capital, is a violation of the federal statutes."

Appellant, however, as already stated, denies that this case involves such "competing moneyed capital."

It is also apparent from the record, and appears to be conceded by appellant in his brief, that, in lieu of taxes upon the shares of capital stock in the incorporated mortgage companies and finance companies here involved, taxes are imposed upon the taxable property of such companies, but that from such taxes the portion of such property representing United States bonds and other nontaxable securities are exempted. Inasmuch as the value of such nontaxable securities necessarily enters into the true value of the shares of capital stock in national banks upon the basis of which such shares are, as already noted, taxed, it seems clear that this failure of the state to tax similarly either the assets of the mortgage and finance corporations or the shares of the capital stock therein, with respect to such nontaxable securities, constitutes discrimination, within the meaning of the federal statute with which we are here concerned. Montana National Bank v. Yellowstone County, 276 U. S. 499, 48 S. Ct. 331, 72 L. Ed. 673. It is contended by the appellant, and is apparently held in the opinion of the majority of this court, that a contrary conclusion was reached by the Supreme Court in Des Moines National Bank v. Fairweather, 263 U. S. 103, 44 S. Ct. 23, 68 L. Ed. 191. That case, however, like the case of First National Bank v. Chapman, 173 U. S. 205, 19 S. Ct. 407, 43 L. Ed. 669 (also cited here by the majority of this court), but, unlike the present case, involved the validity of taxation as between national banks and individual bankers operating unincorporated banks, and is therefore not applicable here. This was pointed out by the Supreme Court in the case of Montana National Bank v. Yellowstone County, supra, in which (276 U. S. at page 503, 48 S. Ct. 331, 333, 72 L. Ed. 673) that court said: "It is contended for the defendants in error that, since the exemption from taxation of the federal securities in the hands of the state banks is created by federal statute, the discrimination is one which the state could not avoid. It is said that it was so de-

cided in Des Moines Nat. Bank v. Fairweather, 263 U. S. 103, 44 S. Ct. 23, 68 L. Ed. 191. But this view of that decision is entirely erroneous. The statutes of Iowa there under review expressly provide that shares of stock in national banks and state and savings banks and loan and trust companies located in the state shall be assessed to the individual stockholders, and shares of national banks and those of competing state corporations are put, for purposes of taxation, upon terms of exact equality. The provision of the Iowa statute which was assailed related to the assessment of capital employed by individual bankers (p. 105 [of 263 U. S. (44 S. Ct. 23)]), and this court held that the restriction of section 5219 [12 USCA § 548] was not violated because the state, perforce, allowed a deduction of federal securities in assessing the capital of such individual bankers; that the federal law made such securities exempt and the state merely respected the exemption. Page 117 [of 263 U. S. (44 S. Ct. 23)]. The decision in no way affects the rule (Van Allen v. Assessors [3 Wall. 573, 18 L. Ed. 229], and other cases, supra) that in respect of the taxation of state corporate banks, the shares must be taxed as they are in the case of national banks, so far as necessary to prevent discrimination, and that, in neither case, does the exemption of federal securities apply in the taxation of such shares."

It is also shown by the evidence that, for purposes of taxation, each of the mortgage companies and finance companies involved is permitted, by the state statutes, to select its own "charter domicile," which is purely nominal and has no necessary relation to the place where such company conducts its business, while the shares of capital stock in every national bank are required, by such statutes, to be taxed "only in the city, ward, or village where such bank is located." The record indicates that this results in the imposition of taxes upon the capital of such national bank at a greater rate than that at which taxes are assessed against the competing moneyed capital of such mortgage and finance companies, and it constitutes, in my opinion, discrimination in violation of section 5219, as amended.

I cannot avoid the conclusion that the decree of the District Court is correct, and should be affirmed.