**CITY LOAN AND SAVINGS COMPANY,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.
Civ. No. 8103.

United States District Court
N. D. Ohio,
Western Division.
Aug. 28, 1959.

Ross W. Shumaker and Robert G. Clayton of Shumaker, Loop & Kendrick, Toledo, Ohio, for plaintiff.

Fred J. Neuland, Washington, D. C., and Richard M. Colasurd, Asst. U. S. Atty., Toledo, Ohio, for defendant.

KLOEB, Chief Judge.

The Court having heard the evidence, reviewed the stipulations on file, studied the briefs of the parties and heard oral argument, upon the evidence makes the following findings of fact and conclusions of law:

Findings of Fact

1. Plaintiff, herein called "taxpayer", is a corporation organized on July 29, 1912, under the laws of the State of Ohio governing building and loan associations (Rev.Code, Ch. 1151), with its principal office in the Savings Building, Lima, Ohio. It is, and has been since its incorporation, engaged continuously in the personal loan and finance business in the State of Ohio and licensed to carry on such business under the Small Loan Act of the State of Ohio (Rev.Code, Ch. 1321). In the conduct of its business it operates, and during the period herein involved, operated many offices and places of business throughout the State of Ohio. (Stip. Facts, par. 2)

2. In the year 1951, and since the date of its incorporation, taxpayer has been subject to supervision and inspection of its financial status and operations by the Superintendent of Building and Loan Associations of the State of Ohio, and has been required to render, and has rendered, annual and semi-annual reports to the Superintendent of Building and Loan Associations concerning its financial status and operations (Rev. Code, Ch. 1155). In 1951, since said time and for a long time prior thereto, the loans made by the taxpayer have been under the supervision of the Division of Securities, Department of Commerce of the State of Ohio (Rev.Code, Ch. 1707). (Stip. Facts, par. 3)

3. In order to provide capital for carrying on its small loan and personal finance business, the taxpayer in the year 1951 and at all times since its incorporation, accepted funds from persons, firms and corporations, including financial institutions, for which it issued certificates of deposit, bearing interest and payable in accordance with the withdrawal and other provisions of its Constitution and By-Laws (Sec. XV and Sec. XIX of the By-Laws). Said funds were not subject to check, draft or payment on demand by the certificate holder. (Stip. Facts, pars. 5 and 6)

4. Said funds accepted by taxpayer from persons, firms and corporations, in-

cluding financial institutions, for which the taxpayer issued certificates of deposit, were accepted in good faith by the taxpayer for the purpose of its business and were used in its business. (Supp. Stip., par. 2)

5. The business of the taxpayer since the date of its incorporation has consisted in the making of chattel loans and the financing of commercial paper. In the years 1951 and 1952 the largest source of income was the making of chattel loans, approximately three-fourths of which were for the purpose of aiding borrowers in the payment of bills, consolidating debts, overcoming financial difficulties, meeting medical and educational expenses and other emergencies and personal uses, no chattel loan to any one person exceeding $1,000 in amount. At the close of the year 1951 there were outstanding 240,204 loans of all types, averaging approximately $315 each. (Stip. Facts, par. 7)

6. Taxpayer as an Ohio building and loan company was organized, supervised and operated under different statutory provisions from those under which commercial banks in Ohio were organized, supervised and operated (Banks, Rev. Code, Ch. 1101; Building and Loan Companies, Ch. 1151). (Stip. Facts, par. 9)

7. Taxpayer has never used, nor has it been permitted under the statutes of Ohio, to use, in its corporate name, any of the following words: "bank", "banking", "trust", "federal", "national", "U. S.", "United States" or "international" (Rev.Code § 1151.07), the use of such terms being restricted to banks; and all other persons, firms or corporations have been and are prohibited from soliciting, accepting or receiving deposits, or from using such words in such fashion (Rev. Code § 1101.02). (Stip. Facts, par. 10)

8. In its taxable year 1951, and prior and subsequently thereto, taxpayer could not perform the following acts and transactions, all of which could be performed by commercial banks, to-wit: (a) accept commercial accounts or funds subject to check; (b) issue certified checks; (c) accept deposits payable on demand; (d) accept bank deposits; (e) issue letters of credit; (f) accept items for collection; (g) qualify for and obtain trust powers; (h) pledge assets to secure public funds; (i) receive money for transmission to foreign countries; (j) make loans without security; (k) acquire or hold stock in any corporation; and (l) become a member of the Federal Reserve System. Building and loan companies are and were in the relevant years exempt from the usury laws with respect to dues, fines, interest and premiums on loans (Rev.Code § 1151.21) which is not true of commercial banks. (Stip. Facts, par. 11)

9. Taxpayer has never, at any time, used any sign or name at any place of business which would indicate that such place of business is the place or office of a bank or trust company, or that deposits are received as a bank or trust company, or that payments are made on a check, or that any other form of banking or trust company business is transacted on its premises. (Stip. Facts, par. 12)

10. Taxpayer has never made use of or circulated any letterheads, billheads, blank notes, blank receipts, certificates or circulars, or any printed or written or partly printed and partly written paper whatsoever having thereon any word or words indicating that its business is the business of a bank or trust company. (Stip. Facts, par. 13)

11. In its taxable years 1951 and 1952, taxpayer paid interest on money deposited with it as follows: on straight certificates, 3% per annum; on certificates if money was left for one year or more, 3½%; on passbook accounts, 2½%; and on employees' special savings plans, depending on the amount of the deposit, 3% up to 8%. In said taxable years 1951 and 1952 commercial banks in Lima, Wapakoneta and Fostoria, Ohio, in which cities taxpayer raised all its capital in said years, paid interest on both savings accounts and certificates of deposit at the rate of 1% per annum. (Stip. Facts, par. 14)

12. Taxpayer has never been a member of the Federal Reserve System, a member of the Federal Deposit Insurance Corporation or designated as a depositary for State or Federal funds. (Stip. Facts, par. 15)

13. Taxpayer has never engaged in any of the primary banking functions of discount, deposit or circulation. (Stip. Facts, par. 16)

14. The tax sought to be recovered in this suit was paid by taxpayer to the District Director of Internal Revenue, 10th District, in Toledo, Ohio, in the Northern District of Ohio, Western Division of this Court. (Stip. Facts, par. 17)

15. On or about March 11, 1952, taxpayer filed with the Collector or Director of Internal Revenue at Toledo, Ohio, its federal income and excess profits tax returns for the calendar year 1951, reflectting the income and excess profits tax liability of taxpayer for said year in the total amount of $2,944,367.77 allocated as follows:

| | |
|---|---|
| Income tax | $2,771,353.98 |
| Excess profits tax | 173,013.79 |
| | |
| Total | $2,944,367.77 |

Said income and excess profits taxes were paid by the taxpayer to the District Director of Internal Revenue, Toledo, Ohio, on the dates and in the amounts as follows:

| | |
|---|---|
| March 11, 1952 | $1,030,528.72 |
| June 15, 1952 | 1,013,132.78 |
| September 15, 1952 | 437,927.47 |
| December 4, 1952 | 462,778.80 |
| | |
| Total | $2,944,367.77 |

(Stip. Facts, par. 18)

16. On or about May 26, 1952, taxpayer filed with the Director of Internal Revenue amended income and excess profits tax returns for the year 1951, in which an error in the original returns was corrected, and on said amended returns the income and excess profits tax liability for 1951 of the taxpayer was reflected as being in the total amount of $2,919,516.44 in lieu of $2,944,367.77 as shown by the original returns, a reduction in said tax for 1951 of $24,851.33. No claim for the refund of said $24,851.-33 was filed with said amended returns, and the amount of income and excess profits taxes paid by taxpayer in the year 1952 for said year 1951 is the sum of $2,944,367.77 as shown in paragraph 15 above. (Stip. Facts, par. 19)

17. In preparing its federal income and excess profits tax returns and amended returns for the years 1951 and 1952 (unused excess profits credit in 1952 was carried back to 1951), the taxpayer computed its excess profits tax liability under the provisions of Section 439 of the Excess Profits Tax Act of 1950 (26 U.S.C.A. § 439(b) (1) 1952 ed.), and in accordance therewith considered and treated its certificates of deposit as borrowed capital within the meaning of said Section. (Stip. Facts, par. 20)

18. In filing its federal income and excess profits tax returns and amended returns for its taxable years 1951 and 1952, taxpayer treated its certificates of deposit as borrowed capital for excess profits tax purposes in reliance upon (1) the policy and practice followed by the Commissioner in auditing taxpayer's federal income and excess profits tax returns in the World War II excess profits tax years; (2) the decision of the Tax Court in Economy Savings & Loan Co. v. Commissioner, 1945, 5 T.C. 543, and the failure of the Commissioner to prosecute an appeal therefrom; and (3) the acquiescence of the Commissioner in said decision of the Tax Court, and the accompanying announcement that such acquiescence was for the information of taxpayers and the general public, and that "Decisions so acquiesced in should be relied upon by officers and employees of the Bureau of Internal Revenue as precedents in the disposition of other cases" (Cum.Bull.1945, p. iv and p. 3). (Stip. Facts, par. 21)

19. On May 5, 1953, taxpayer filed with the District Director of Internal Revenue at Toledo, Ohio, its claim for refund requesting the refund of income

and excess profits taxes paid by it for the year 1951 in the amount of $206,220.78 for the reasons and upon the grounds (the borrowed capital issue was not involved) fully set forth in said claim for refund to which reference is hereby made. The agent of the Internal Revenue Service who reviewed the said claim for refund recommended the allowance thereof in the amount of $206,191.51, which recommendation and finding was approved by the Acting District Director of Internal Revenue at Toledo, Ohio. (Stip. Facts, par. 22)

20. Subsequently the Appellate Division, Internal Revenue Service, Cleveland, Ohio, to which the matter of said refund of 1951 income and excess profits taxes had been referred for review, preparatory to submission to the Joint Committee on Internal Revenue Taxation in accordance with Section 6405(a) of the Internal Revenue Code of 1954, 26 U.S. C.A. § 6405(a), determined that taxpayer was not entitled to the refund as recommended by the agent and approved by the Acting District Director of Internal Revenue, for the reason that upon a different issue—the borrowed capital issue —the taxpayer was liable for excess profits taxes for said year 1951 in the amount of $649,612.87, and that after crediting thereon the said sum of $206,-191.51, found due to the taxpayer on its claim for refund for said year, as described in paragraph 19, there was left a deficiency in excess profits taxes due from the taxpayer for said year of $443,-421.36, plus interest. Said Appellate Division determined that the income and excess profits tax liability of the taxpayer for the year 1951 was in the total amount of $3,387,789.13 allocated as follows:

| | |
|---|---|
| Excess profits tax | $ 649,612.87 |
| Normal tax and surtax | 2,738,176.26 |
| Total | $3,387,789.13 |

(Stip. Facts, par. 23)

21. On October 28, 1957, said Appellate Division formally notified taxpayer with respect to said deficiency of $443,-421.36, and on November 15, 1957, the District Director of Internal Revenue, Toledo, Ohio, demanded payment of said deficiency together with interest thereon in the sum of $149,931.08. Thereafter, on November 21, 1957, taxpayer under protest paid to the said District Director the deficiency of $443,421.36, together with interest thereon of $149,931.08, a total of $593,352.44. (Stip. Facts, par. 24)

22. The federal income and excess profits tax returns filed by taxpayer for its taxable years 1951 and 1952, in which its tax liability was computed after according borrowed capital treatment to its certificates of deposit, were approved by the examining agent and by the District Director of Internal Revenue without any exception, the Appellate Division at Cleveland, Ohio, first having taken exception to said returns by disallowing borrowed capital treatment to said funds. (Stip. Facts, par. 25)

23. The determination by the Appellate Division of the Internal Revenue Service above referred to was made upon the premise that the taxpayer in the computation of its 1951 and 1952 excess profits credits based on income (the year 1952 is involved to the extent of the carryback from that year to 1951 of unused excess profits credit), was not entitled to consider and treat as "borrowed capital", within the meaning of Section 439 of the Excess Profits Tax Act of 1950, said certificates of deposit issued by the taxpayer in accordance with its Constitution and By-Laws. (Stip. Facts, par. 26)

24. Taxpayer learned for the first time in the month of January 1957 of the determination of the Appellate Division of the Internal Revenue Service at Cleveland, Ohio, to deny borrowed capital treatment, for excess profits tax purposes, to taxpayer's certificates of deposit in the years 1951 and 1952. This determination of the Appellate Division affected not only taxpayer's taxable year 1951, but also its taxable years 1952 and 1953, involving an additional excess profits tax liability for said three years, including interest, of approximately $2,750,000.

Said deficiencies in tax for said years, including the large sums of interest payable thereon, had not been anticipated by taxpayer and no reserves therefor had been provided or set up. (Stip. Facts, par. 27, and Supp. Stip., par. 4)

25. On February 25, 1958 (within the time stipulated between the Commissioner and taxpayer), taxpayer filed with the District Director of Internal Revenue for the Tenth District at Toledo, Ohio, its claim for refund demanding that the Commissioner refund to it the sum of $649,612.87, representing income and excess profits taxes determined and assessed by the Internal Revenue Service against taxpayer for said year 1951, together with interest paid by it on November 20, 1957, of $149,931.08, with interest on said sums computed according to law. A true copy of said claim for refund is attached to the complaint herein, marked Exhibit A and made part thereof. (Stip. Facts, par. 28)

26. Said claim for refund was disallowed by the District Director of Internal Revenue on May 27, 1958, which disallowance was confirmed by registered mail dated August 21, 1958, addressed to taxpayer by the District Director. (Stip. Facts, par. 29)

27. In all World War II excess profits tax years the Commissioner of Internal Revenue allowed taxpayer to include as borrowed capital, for excess profits tax purposes, its certificates of deposit of the same character as those employed by it for raising money in the years 1951 and 1952; and the federal income and excess profits tax returns of taxpayer for each and all of the World War II excess profits tax years are and have long since been closed so far as the taxpayer and the Internal Revenue Service are concerned. (Stip. Facts, par. 30)

28. The taxpayer and The Economy Savings and Loan Company, of Columbus, Ohio, are both building and loan companies organized under the same statutory law and for the same purpose, supervised and operated under the same Ohio statutes, employing in the year 1951 identical methods for raising capital to carry on business, including substantially identical certificates of deposit, deriving their principal income from the same type of business, and said two companies are and have been since 1923 the only building and loan companies in Ohio conducting, and authorized to conduct, a small loan and personal finance business (Rev.Code § 1151.29(E)). (Stip. Facts, par. 8)

29. In all World War II excess profits tax years The Economy Savings and Loan Company was permitted by the Internal Revenue Service to treat moneys raised through its certificates of deposit as borrowed capital; and likewise in its taxable years 1951, 1952 and 1953 The Economy Savings and Loan Company filed its excess profits tax returns in which it treated the funds attributable to its certificates of deposit as includible in borrowed capital, and the Internal Revenue Service after examining said returns for each of said years approved the same without raising any question or taking any exception to the fact that borrowed capital treatment had been given the funds received from the holders of its certificates of deposit; and the returns of said taxpayer for said years have been and are closed so far as the Internal Revenue Service is concerned. (Dep. G. Robert Becker, pp. 11, 12, 17)

30. On March 23, 1959, the Commissioner of Internal Revenue announced his nonacquiescence in the decision of the Tax Court in Economy Savings & Loan Co. v. Commissioner, 1945, 5 T.C. 543, accompanied by the statement that the acquiescence published in C.B.1945, 3 is withdrawn and nonacquiescence is substituted therefor (Int.Rev.Bull.No. 1959–12, p. 9). (Stip. Facts, par. 31)

31. While this suit involves primarily taxpayer's taxable year 1951, in computing its tax liability for said year taxpayer was entitled to, and did, pursuant to the applicable section of the Code, carry back certain unused excess profits credit to said year from its taxable year 1952 and that fact necessitated, in determining taxpayer's 1951 excess profits tax

**850**

liability, the taking into account as well its 1952 excess profits tax liability, which will explain the references and data in some of the paragraphs of these findings relating to the year 1952. (Stip. Facts, par. 32)

32. References to Ohio statutes in these findings are to the Revised Code now in effect, but substantially identical provisions of the General Code were in effect at all times and dates referred to in these findings. (Stip. Facts, par. 33)

## Conclusions of Law

1. The Court has jurisdiction of the action, of the parties and of the subject matter of the suit (28 U.S.C. § 1346(a) (1)).

■ 2. The sole issue presented in this case for decision (and the parties have so stipulated, Supp.Stip., par. 2) is whether the funds received by taxpayer from persons, firms and corporations, including financial institutions, for which the taxpayer issued certificates of deposit in the relevant years, were entitled, for the purpose of determining excess profits credit, to be considered and treated as borrowed capital within the meaning of the Excess Profits Tax Act of 1950 (26 U.S.C.A. § 439(b) (1) 1952 ed.).

3. The funds received by taxpayer from persons, firms and corporations, including financial institutions, for which the taxpayer issued certificates of deposit in the relevant years, constituted an outstanding indebtedness of the taxpayer to the holders of such certificates, incurred in good faith for the purposes of taxpayer's business.

4. The certificates of deposit issued by taxpayer to persons, firms and corporations, including financial institutions, depositing funds with the taxpayer in the relevant years were certificates of indebtedness within the meaning of the term as used in the Excess Profits Tax Act of 1950 (26 U.S.C.A. § 439(b) (1) 1952 ed.).

5. The funds raised by taxpayer through the issuance of certificates of deposit to persons, firms and corporations, including financial institutions, constituted borrowed capital within the meaning of the definition of that term contained in the Excess Profits Tax Act of 1950 (26 U.S.C.A. § 439(b) (1) 1952 ed.), and were properly includible by taxpayer as borrowed capital in the filing of its federal income and excess profits tax returns and amended returns for its taxable years 1951 and 1952. Economy Savings & Loan Co. v. Commissioner, 1945, 5 T.C. 543, modified and affirmed on other issues, 6 Cir., 1946, 158 F.2d 472; Jackson Finance & Thrift Co. v. Commissioner, 10 Cir., 1958, 260 F.2d 578.

■ 6. The funds obtained by taxpayer in the relevant years through the issuance of certificates of deposit to persons, firms and corporations, including financial institutions, were invested in the business of the taxpayer by the holders of said certificates, and said certificates of deposit constituted investment securities within the meaning of Treasury Regulations, Section 40.439–1 (f) (Treas.Reg. 130, Int.Rev.Code 1939). Economy Savings & Loan Co. v. Commissioner, supra; Stoddard v. Miami Savings & Loan Co., 6 Cir., 1933, 63 F.2d 851.

■ 7. Taxpayer was not a bank within the definition of the term "bank" contained in Section 104 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 104, nor within the provisions of the statutes of Ohio which distinguish clearly between banks on the one hand and building and loan companies on the other. Jackson Finance & Thrift Co. v. Commissioner, 10 Cir., 1958, 260 F.2d 578, 582; Hoenig v. Huntington National Bank, 6 Cir., 1932, 59 F.2d 479, 482; United States v. Cambridge Loan & Building Co., 1928, 278 U.S. 55, 58, 49 S.Ct. 39, 73 L.Ed. 180.

■ 8. By re-enacting in the Excess Profits Tax Act of 1950 the statutory definition of borrowed capital for purposes identical with that definition's original purpose as included in the Excess Profits Tax Act of 1939 and without

substantial change in the definition, it must be presumed that Congress approved and intended to adopt the judicial interpretation placed upon that definition by the Tax Court in Economy Savings & Loan Co. v. Commissioner, 1945, 5 T.C. 543, and the administrative interpretation placed upon the Congressional definition by the Commissioner of Internal Revenue through regulation, and the formal acquiescence of the Commissioner in the result reached in the Economy case. Jackson Finance & Thrift Co. v. Commissioner of Internal Revenue, 10 Cir., 1958, 260 F.2d 578, 581.

■ 9. The Commissioner of Internal Revenue either lacked power to deny, or was equitably estopped from denying, borrowed capital treatment to the funds raised by taxpayer through the issuance of certificates of deposit because the taxpayer, in good faith, had filed its federal income and excess profits tax returns and had treated such funds as borrowed capital, in reliance upon and being lured by the acquiescence of the Commissioner of Internal Revenue in the conclusion reached in the Economy case and his official pronouncements in connection therewith (Finding of Fact No. 18), and incurred substantial prejudice in the way of large interest charges and the failure to set up reserves, directly due to the change of position of the Commissioner of Internal Revenue. Woodworth v. Kales, 6 Cir., 1928, 26 F.2d 178, 181; H. S. D. Co. v. Kavanagh, 6 Cir., 1951, 191 F.2d 831, 846.

■ 10. The doctrine of equitable estoppel does not bar correction by the Commissioner of Internal Revenue of a mistake of law, but in this case it does not appear that there was a mistake of law, a mistake of fact, or other lawful excuse for the Commissioner to change his position, to the prejudice of the taxpayer, merely because the Commissioner entertained a different view or change of opinion in 1957, or a "matured and better judgment" of the same factual situation which existed in 1945. Woodworth v. Kales, supra; H. S. D. Co. v. Kavanagh, supra.

■ 11. The change of position by the Commissioner of Internal Revenue, first made known to taxpayer in January 1957, denying borrowed capital treatment to the funds raised by certificates of deposit issued by taxpayer to holders for the purpose of raising money to carry on its business, and his action in making an individual, retroactive and discriminatory application of such change of position to taxpayer, while allowing borrowed capital treatment to like funds of The Economy Savings & Loan Company which was identically organized, supervised and operated, constituted inequitable conduct by the Commissioner, if not an unlawful abuse of discretion within the meaning of Section 7805(b) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7805(b). Lesavoy Foundation v. Commissioner, 3 Cir., 1956, 238 F.2d 589, 591, 592; Automobile Club of Michigan v. Commissioner, 1957, 353 U.S. 180; 185, 77 S.Ct. 707, 1 L.Ed.2d 746.

12. Taxpayer is entitled to judgment against the defendant in the sum of $799,543.95, with interest on $76,161.13 at 6% per annum computed from December 4, 1952, on $130,030.38 at 6% per annum computed from May 6, 1953, and on $593,352.44 at 6% per annum computed from November 21, 1957, and for its allowable costs.