**JACKSON FINANCE and THRIFT CO., a Utah corporation, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**FORD FINANCE COMPANY, a Utah corporation, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 5893, 5894.**

United States Court of Appeals
Tenth Circuit.

Oct. 21, 1958.

Sanford M. Stoddard, Salt Lake City, Utah (K. Jay Holdsworth, Salt Lake City, Utah, was with him on the brief), for petitioners.

Marvin W. Weinstein, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Grant W. Wiprud and Kenneth E. Levin, Attys., Dept. of Justice, Washington, D. C., were with him on the brief), for respondent.

Before BRATTON, Chief Judge, and PHILLIPS and LEWIS, Circuit Judges.

LEWIS, Circuit Judge.

These appeals from a decision of the Tax Court were consolidated, as were the proceedings below, because of the existence of a controlling law question. No. 5893 involves tax deficiencies imposed upon Jackson Finance and Thrift Co. for the fiscal years ended April 30, 1951, 1952 and 1953; the companion case imposes similar deficiencies upon Ford Finance Co. for the calendar years 1951, 1952 and 1953.

The controversies arose under the Excess Profits Tax of 1950 and the determinative question, answered in the negative by the court below, is whether or not monies received by the taxpayers through the issuance of "thrift certificates" constitute borrowed capital for the purposes of excess profits credit. Section 436 of the Internal Revenue Code of 1939 (26 U.S.C.A. Excess Profits Taxes, § 436) allows an excess profit credit based on invested capital, and for the purposes of this credit Section 437 (26 U.S.C.A. Excess Profits Taxes § 437) provides that invested capital shall include a certain percentage of borrowed capital. Section 439(b) (1) of the Act and Code, as we will later more particularly note, defines borrowed capital.

Each of the taxpayers is an industrial loan corporation organized and operating under the statutory authority of the State of Utah. 7–8–1 et seq., Utah Code Ann.1953; 7–6–1 et seq., Utah Code Ann. 1943, as amended. The companies are primarily engaged in the making of interest bearing loans to individuals, repayable in uniform installment payments and within the rate, time and security limitations set by the applicable Utah statutes, supra. The Utah Code, now 7–8–3, Utah Code Ann.1953, also empowers industrial loan corporations to "issue and sell certificates for the payment of money at any time, either fixed or uncertain, and to receive payments therefor in installments or otherwise, with or without allowance of interest on such installments; provided, that nothing herein shall be construed to authorize such corporations to receive deposits or to create any liability due on demand. The certificates issued by any such corporation shall be approved as to form by the bank commissioner, and shall bear upon the face of the instrument the words, 'This is not a certificate of deposit.'" In compliance with this statutory authorization each company issued what they termed "thrift certificates" in the following form:

"This Is To Certify that ———— of ———— has delivered to Jackson Finance & Thrift Co. (Ford Finance Company), a corporation, the sums of money as listed hereafter and in consideration of the same, the said corporation agrees to repay the said sums to the said party or order as herein provided with interest payable at the rate of —— per centum from date until paid. Amounts of less than $100.00 shall not draw interest under this Contract.

"This Thrift Book may be issued as payable to one or more persons in which case payment to the persons producing this Thrift Book and appearing to be either one or the other of such owners, shall have the same force and effect as if there were only one owner.

"The said corporation reserves the right to retain this Thrift Book at its face value with accrued interest on any date, by giving notice in writing, by registered mail, to the last known address of the owner or owners hereof as furnished to the said corporation by the owner hereof,

of its intention to redeem the same, and interest shall cease on and after ten (10) days from the mailing of such notice.

"The said corporation will redeem this Thrift Book at any time on the request of an owner hereof at its face value and accrued interest, subject to the right of the Corporation to require thirty days notice in writing, and to limit the aggregate amount of withdrawal payments of its thrift books in any one calendar month to an amount not exceeding one-half its net receipts of the previous calendar month.

"This Is Not A Certificate Of Deposit.

"In Witness Whereof the said corporation has caused this Thrift Book to be signed by its duly authorized officer and its seal to be affixed hereto this —— day of ————, 19——.

"Jackson Finance & Thrift Co.

"(Ford Finance Company)

"By ————————— Withdrawals may be made from this account on the signature, or signatures, appearing below.

————————————
————————————"

A single thrift certificate book was used to evidence a continuing relationship between taxpayers and their customers, notations being entered in the books to indicate monies received by the companies or withdrawn by the customers. The books were surrendered upon complete withdrawal of individual accounts and, in actual practice, the companies required no notice from their customers of intent to withdraw from the accounts. Interest at the rate of 4% [1] was paid upon the accounts.

During the years pertinent to present inquiry the Ford Finance Company had a daily average of outstanding indebtedness attributable to the issuance of thrift certificates of an amount, again averaged for the three-year period, of over $800,-

000; the Jackson company, of over $90,-000. It is these amounts that the Tax Court determined not to be borrowed capital within the meaning of Sec. 439(b) (1), supra, which defines such capital as including—

"* * * the outstanding indebtedness (not including interest) of the taxpayer, incurred in good faith for the purposes of the business, which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, deed of trust, bank loan agreement, or conditional sales contract."

In aid of the statutory definition of borrowed capital under the Excess Profits Tax of 1950 the Treasury Department promulgated its regulation Sec. 40.-439–1(f), (Treas.Reg. 130, Int.Rev.Code, 1939), which defined certificates of indebtedness thus:

"(f) The term 'certificate of indebtedness' includes only instruments having the general character of investment securities issued by a corporation as distinguishable from instruments evidencing debts arising in ordinary transactions between individuals. The term 'conditional sales contract' means a contract corresponding to a mortgage except that the transfer of title is made dependent upon the payment of the stipulated price. Borrowed capital does not include indebtedness incurred by a bank arising out of the receipt of a deposit and evidenced, for example, by a certificate of deposit, a passbook, a cashier's check, or a certified check, and the term 'bank loan agreement' does not include the indebtedness of a bank to a depositor."

In 1945, the Tax Court had occasion to consider the identical question which now reaches us through this appeal. In such year the same statutory definition of borrowed capital was in effect under the World War II Excess Profits Tax Act

---

[1] Commercial savings bank in the same community were then paying 2½% upon deposits.

(Public Law No. 801, 76th Cong. 3d Sess., Oct. 8, 1940, 54 Stat. 975) and the departmental regulations defined certificate of indebtedness in the same terms [2] as the later regulation set out above. In Economy Savings and Loan Co., 5 T.C. 543, modified on appeal on other issues, 6 Cir., 158 F.2d 472, the Tax Court concluded that monies received by the taxpayer through that company's issuance of "certificates of deposit" were an indebtedness evidenced by a certificate of indebtedness and that as a consequence the taxpayer was entitled to a tax credit for borrowed capital. The Commissioner did not question this ruling on appeal and in fact issued his formal acquiescence to the ruling of the case.

Both the decision of the Tax Court in the instant case and the position of the Commissioner on present appeal recognize a direct reversal of the earlier position taken by each in Economy and rely upon the authority of Commissioner of Internal Revenue v. Ames Trust & Savings Bank, 8 Cir., 185 F.2d 47, as dictating the necessity therefor. We can see no such compulsion in the rationale of Ames and most certainly not in its express words for it is there stated at page 50:

> "We should perhaps add that we do not consider Economy Savings & Loan Co. v. Commissioner, 5 T.C. 543, affirmed on other grounds, 6 Cir., 158 F.2d 472, cited by the Tax Court and relied upon by the bank here, as being in any way applicable to the present situation. Under the contract governing the dealings of the parties, the funds received by the loan company in that case were not of the nature of a deposit transaction with a bank, as the court itself

there recognized, in saying that 'Respondent's suggestion that petitioner was really in the banking business and that the funds evidenced by the certificates herein involved are analogous to the deposits of a bank is not borne out by the evidence.' "

Just as the distinction between deposit liability of banks and the commercial indebtedness of loan companies was recognized in Economy it was further held determinative in Ames.

■■ At the time that Congress enacted the Excess Profits Tax Act of 1950 it failed to amend, revise or in any way alter the definition of borrowed capital as it was contained in the earlier World War II Act except to add transactions evidenced by conditional sales contracts and bank loan agreements. At such time the judicial interpretation of the Tax Court in Economy, the administrative interpretation of the Treasury Department through regulation, and the formal acquiescence of the Commissioner in the holding of Economy were all part and parcel of the actual and effective administration of the earlier tax statute. The distinction between the deposit liability of a bank and the nature of a borrowing transaction such as we here consider had, in 1950, been recognized both judicially and administratively. By re-enacting the statutory definition of borrowed capital for purposes identical with that definition's original purpose it must be presumed that Congress both approved and intended to adopt the judicial and administrative interpretation and construction that had been placed upon its words by those responsible for statutory interpretation and administration. Such rule is a fundamental principle of statutory interpretation [3] and is dispositive of the

2. Treas.Reg. 112, Sec. 35.719–1, Int.Rev. Code, 1939.

3. United States v. Ryan, 284 U.S. 167, 52 S.Ct. 65, 76 L.Ed. 224; Hecht v. Malley, 265 U.S. 144, 44 S.Ct. 462, 68 L.Ed. 949; Commissioner of Internal Revenue v. F. G. Bonfils Trust, 10 Cir., 115 F.2d 788; Bakelite Corporation v. National Aniline & Chemical Corp., 2 Cir., 83 F.2d 176; Carroll Electric Co. v. Snelling, 1 Cir., 62 F.2d 413; Sanger v. Lukens, 9 Cir., 26 F.2d 855; Barnhill v. Commissioner, 5 Cir., 241 F.2d 496; cf. Commissioner of Internal Revenue v. Glenshaw Glass Co., 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483; Diamond v. Sturr, 2 Cir., 221 F.2d 264.

instant case unless successful contention can be made that a factual situation here exists which would put taxpayers within the rule applicable to banks. And such is the Commissioner's principal claim in argument before this Court although the Tax Court refused to pass on the merits of such contention.[4] Since the burden is upon taxpayers to prove that the deficiencies imposed upon them are wrong under any proper theory it is our duty to consider all contentions of the Commissioner that might sustain the contrary view. Cf. Helvering v. Gowran, 302 U.S. 238, 58 S.Ct. 154, 82 L.Ed. 224.

Sec. 438(g) of the 1939 Code relates the term "bank" as contained in Sec. 104 of that Code, 26 U.S.C.A. (I.R.C. 1939) § 104, to the excess profits tax and so defines bank thus:

> " * * * a bank or trust company incorporated and doing business under the laws * * * of any State * * *, a substantial part of the business of which consists of receiving deposits and making loans and discounts * * * and which is subject by law to supervision and examination by State, Territorial or Federal authority having supervision over banking institutions."

Under the law of Utah,[5] industrial loan companies are subject to regulation through the supervision of the State Bank Commissioner and to this extent fall clearly within the definition of a bank as defined above. And it would be unrealistic not to note the marked similarity in business procedure between the intake of funds by a bank through savings deposits and that of the taxpayers through the issuance of the thrift certificates. But it would be equally unrealistic not to note that such similarity is limited to form and does not exist either in law or fact. Depositors place their money in banks primarily for safekeeping, secure in the knowledge that many governmental restrictions, both state and federal, are placed upon banks to assure and sometimes, as in the case of Federal Deposit Insurance banks, to insure the safety of the deposit. "Bank" and "bank deposit" are terms as well known in common parlance as they are in technical commercial use. And the terms do not include industrial loan companies nor monies received by sale of thrift certificates either in actual or technical understanding. Money paid for thrift certificates (or other evidences of indebtedness whatever called) are intended as investments, influenced largely by the promise of payment of a high rate of interest, here 4%, but with a concomitant risk. Bank deposits are made at a lower rate of interest, here 2½%, for safekeeping.

To preserve both the legal and actual concept of the term "bank" and "bank deposit" Utah has adopted many statutory safeguards so that the issuance of thrift certificates cannot be confused with banking functions. The certificates must state on their face: "This is not a certificate of deposit." Industrial loan companies are prohibited from using the word 'bank' or 'bank deposit' in their business. Now 7–3–57, Utah Code Ann. 1953. And they cannot accept deposits.[6] Industrial loan companies cannot become members of the federal reserve system and are not eligible for deposit insurance with any federal agency. It seems clear that taxpayers are not banks, are not performing banking functions, and are not receiving bank deposits through the issuance of their thrift certificates. Such certificates are, and are intended to be, evidences of indebtedness to a purchaser

---

4. Opper, J., dissenting, stated: "It seems to me impossible to dispose of this case on the authority of respondent's regulation without concluding that petitioner was a 'bank.' "

5. Now 7–8–1 et seq., Utah Code Ann.1953.

6. As part of the record in this case the Commissioner stipulated that the taxpayers "had never engaged in any of the primary banking functions of discount, *deposit* or circulation." Although counsel had difficulty during oral presentation in justifying his argument that taxpayers were banks in view of this stipulation we have preferred to place no emphasis upon the stipulation.

who has invested, and has intended to invest, in a corporate security rather than make a deposit for safekeeping. The judgments of the Tax Court are accordingly severally

Reversed.